St. Louis-San Francisco Railroad Company *v.* Pearson.

## Opinion, delivered March 29, 1926.

1. MASTER AND SERVANT—BURDEN OF PROVING NEGLIGENCE.—In an action against a railroad for the negligent killing of a locomotive fireman, brought under the Federal Employers' Liability Act, the burden of proving the master's negligence was upon the plaintiff.

2. TRIAL—DIRECTION OF VERDICT.—It is never proper to direct a verdict against the plaintiff except in cases where, conceding the credibility of the witnesses and giving full effect to every legitimate inference that may be deduced from their testimony, it is plain that he has not made out a case sufficient in law to entitle him to a verdict and judgment thereon.

3. MASTER AND SERVANT—NEGLIGENCE—EVIDENCE.—In an action for the negligent killing of a locomotive fireman, evidence *held* to justify a finding that he met his death in a derailment caused by a broken switch point on the east side of defendant's track.

4. MASTER AND SERVANT—NEGLIGENT KILLING OF SERVANT—INSTRUCTION.—In an action for the negligent killing of a locomotive fireman in a derailment of the engine, the court's instruction properly limited the consideration of the jury to the only ground of negligence relied upon by the plaintiff for a recovery, and left it to the jury to determine whether the evidence established this ground of negligence.

5. TRIAL—GENERAL OBJECTION TO INSTRUCTION.—A general objection to an instruction was insufficient to raise the objection that it used the word "injury", instead of "death", in reference to plaintiff's intestate.

6. MASTER AND SERVANT—DAMAGES FOR NEGLIGENT KILLING—INSTRUCTION.—An instruction to the effect that, if defendant's negligence caused an employee's death, the jury may find such damages as will fully compensate therefor, was not objectionable as failing to limit the damages to the financial loss sustained where another instruction stated the proper measure of damages.

7. MASTER AND SERVANT—EMPLOYERS' LIABILITY ACT—JOINDER OF ACTIONS.—Under the Federal Employers' Liability Act, the right to recover for pecuniary loss to the widow and children of a deceased employee and for conscious pain and suffering endured by the deceased may be had in one action.

8. DEATH—EVIDENCE OF PAIN AND SUFFERING.—Evidence *held* to justify submission to the jury of the question whether plaintiff's intestate endured conscious pain and suffering after receiving the injuries which resulted in his death.

9. DEATH—DAMAGES—EXCESSIVENESS.—W h e r e decedent was 36 years old, with an expectancy of life of 31 years, had an earning capacity of $200 per month, left a widow and two sons, had devoted his life and earnings to the care and support of his family, an award of $30,000 for the pecuniary loss suffered by his family and for his conscious pain and suffering was not excessive.

10. MASTER AND SERVANT—FEDERAL EMPLOYERS' LIABILITY ACT—POST-HUMOUS CHILD.—The Federal Employers' Liability Act, authorizing a recovery in case of death for the benefit of the surviving widow and children of an employee, held to include a posthumous child.

11. MASTER AND SERVANT—FEDERAL EMPLOYERS' LIABILITY ACT—AUTHORITY OF ADMINISTRATRIX.—An administratrix appointed by the clerk in vacation was authorized to sue under the Federal Employers' Liability Act for the negligent killing of her intestate, though her appointment was never acted upon by the probate court.

12. VENUE—ACTION FOR TORT.—An action to recover damages for a wrongful death is in tort, and transitory, and as a general rule may be maintained wherever the wrongdoer can be found.

Appeal from Lawrence Circuit Court, Eastern District; *Dene H. Coleman,* Judge; affirmed.

STATEMENT BY THE COURT.

This suit was brought under the Federal Employers' Liability Act by Eunice Pearson, the widow, as administratrix of the estate of J. L. Pearson, deceased, for the benefit of herself and two minor children against the St. Louis-San Francisco Railway Company, to recover damages for the negligent killing of her husband, a locomotive fireman on an interstate passenger train. The cause of his death was a derailment which occurred while the train was passing over a switch.

On the 11th day of November, 1923, J. L. Pearson was a fireman on a passenger train from Fort Smith, Arkansas, to Springfield, Mo. The train consisted of an engine, tender, baggage car, combination mail and smoker, chair car, cafe car, and two sleepers. The train left Fort Smith about 5:30 A. M., and the derailment occurred at Meadows, a flag station, six miles north of Van Buren, in Crawford County, Ark. The train was

running at the rate of 35 miles an hour, and left the track while going over a switch. The engine ran 305 feet from the switch point after it left the track before it came to a stop. The derailment caused the death of Pearson by his receiving a blow on the head and injuries on his body. The steam pipes in the engine burst and scalded him. Pearson was 36 years of age, and died within a short time after receiving his injuries. He left surviving him his widow, Eunice Pearson, Lloyd Pearson Jr., nine years of age, and Jack Edward Pearson, who was born about six months after the death of his father. It was the theory of the plaintiff that the derailment was caused by a broken switch point on the east rail on the switch at Meadows.

W. R. Willis, a man 51 years of age, was the principal witness for the plaintiff. He was engaged in the real estate business at Van Buren, Ark., but had formerly been a conductor on a railroad for many years. He heard about the wreck of the passenger train soon after it occurred by receiving a telephone message from his sister, who lived near by, and he immediately got in his car and drove there. On account of being an old railroad man, he made an examination for the purpose of trying to determine the cause of the wreck. He looked under one of the cars and found a piece of switch point about six or eight inches long lying at the east rail, right where the point of the switch was. He found the switch point broken off, lying right down by the side of the rail on its east side. The switch point was off of the rail that was on the east side of the track. There was a coach standing at that point, and he knew from the indications of the ground that the train had left the track right about that point. There was a little new break on the top of the switch rail, and there was an old break. The switch point was rusted where it showed it had been cracked from the bottom towards the top. There was about an inch or maybe a little more of the new break. At this point we quote from his testimony the following:

"Q.   Now then, Mr. Willis, I will ask you to explain to the jury if that rail was broken in that manner, and when it was broken, that left exposed what kind of piece there?   A.   That left exposed a piece of rail.   A piece of switch point with a stub end.   And when the train was coming down would naturally—the flange of the other wheel would catch this stub end and mount this switch point and go between the two sidetracks.   Q.   Instead of the rail coming to a feather edge, then, it presented a stub face there, and the flange of the wheel pressing against the other rail would strike that stub and mount it, or split the switch?   A.   Yes sir.   Q.   That would be the logical effect in the operation of a train over the track in that condition?   A.   Yes sir."

The witness then stated that he had been engaged in railroading for twenty years, and made the examination just to satisfy himself as to what caused the accident.   He laid the piece of switch point which he found under the coach on the switch stand.   He does not know what became of it.   Both switch rails were torn up.   He noticed another piece of switch rail about two feet long that was jammed through the engine truck or baggage-car truck on the west side.   It was jammed right through the bolster of the truck.

Tom Meeks was also a witness for the plaintiff.   He went to the scene of the wreck about an hour after it occurred.   The witness lived at Van Buren, Ark., and saw W. R. Willis, who also lived there, with a piece of switch point which he had picked up by one of the trucks.   Willis said that this was the cause of the wreck, and laid the piece of the point on the switch stand over on the west side of the track.   The piece of switch point was about six or eight inches long.   He noticed that the under part of the switch rail had an old crack in it, and that there was a fresh break of about an inch or more at the top.   He could tell that the bottom crack was an old one by the rust on it.

S. C. Grogg, a farmer who lived near the scene of the accident, was also a witness for the plaintiff.   He

saw the broken switch point lying near the switch stand, and said that it was six or eight inches long. He took his cane and pushed it around a little, and a part of it looked bright and new, and part of it looked as if it were rusted and an old break. He did not know what became of the switch point.

The evidence for the plaintiff on the question of whether the decedent suffered conscious pain and suffering will be stated under an appropriate heading in the opinion.

After the wreck occurred, the employees of the defendant took charge of the track and repaired it. Quite a number of witnesses were introduced by the defendant who testified that the switch point on the east side of the track was not broken, and that the same switch rail which was there before the wreck was put back when the track was repaired. They testified positively that the point of the switch rail on the east side was not broken off. They also testified that the switch rail on the west side of the track was broken in three or four pieces, and that they could not find one of the pieces, and that the missing piece must have been six or eight inches long.

In this connection it may be stated that the engineer of the train was not called as a witness, and that the railroad company did not have any theory of its own as to what caused the derailment. As above stated, the theory of the plaintiff was that the derailment was caused by the switch point on the east side of the track being broken off, and the defendant introduced evidence tending to show that this was not the case.

The jury returned a verdict in favor of the plaintiff in the sum of $30,000, and from the judgment rendered the defendant has duly prosecuted an appeal to this court.

*E. T. Miller* and *W. J. Orr,* for appellant.

*Pace & Davis,* for appellee.

Hart, J., (after stating the facts). When the plaintiff's intestate was killed, he was engaged as locomotive fireman on an interstate passenger train, and the cause

of his death was a derailment which occurred while the train was passing over a switch.

The only allegation of negligence relied upon for a recovery by the plaintiff is that the defendant negligently permitted the east switch point at the place where the accident occurred to become defective, thereby causing the engine and cars of the train to be derailed. The suit was brought under the Federal Employers' Liability Act, and the burden of proof to establish the negligence of the defendant was upon the plaintiff. *New Orleans & Northwestern Rd. Co.* v. *Harris,* 247 U. S. 367, and *St. Louis S. W. Ry. Co.* v. *Rogers,* 166 Ark. 389.

The principal ground relied upon by the defendant for a reversal of the judgment is that the evidence is not legally sufficient to support the verdict. Under our judiciary system it is the province of the jury to determine the credibility of the witnesses and the weight of the evidence, under proper instructions as to the principles of law applicable thereto. And the court is never justified in directing a verdict except in cases where, conceding the credibility of the witnesses, and giving full effect to every legitimate inference that may be deduced from their testimony, it is plain that the party has not made out a case sufficient in law to entitle him to a verdict and judgment thereon. *St. L. S. W. Ry. Co.* v. *Ellenwood,* 123 Ark. 428, and *St. L. S. W. Ry. Co.* v. *Rogers,* 166 Ark. 389.

The case of *Railway Co.* v. *Morgart,* 56 Ark. 213, and other cases of like character relied upon by counsel for the defendant, are not controlling under the facts of the case at bar. In the Morgart case, the stringers of a bridge had been raised from four to six inches, and this raised the rails off of the embankment next to the bridge. In other words, the rails at the end of the bridge were swinging, so that they were clear of the ground. The jury might have inferred, from the testimony of an experienced railroad man who arrived at the scene of the accident after it occurred, that the swinging rails at the south end of the bridge were the proximate cause of the wreck.

The court said that it was contrary to common observation and experience that the tender and engine with all the cars of the train could have passed over these swinging rails, and any of the cars remained on the rails south of them afterwards.   The court said that the testimony carried on its face evidence of its falsity, and could not in the nature of things be true.   This was but another way of saying that it was a physical impossibility for the train to have passed over the swinging rails, and any of the cars to have remained on the track, and that the testimony of the witness was contrary to the laws of nature.   Such is not the case here.   There is nothing in the evidence relied upon by the plaintiff to establish negligence which is contrary to the physical facts, and the most that could be said of it is that the decided weight of the evidence tends to show the improbability of the truth of the testimony of the witnesses for the plaintiff.

W. R. Willis, a railroad man of twenty years' experience, was the principal witness for the plaintiff. According to his testimony, he went to the scene of the accident soon after it occurred, and, on account of his experience in working on railroads, he was prompted to try to ascertain the cause of the wreck.   He had observed that the engine had left the track at the switch point on the east side of the track, and that the cars which had been derailed were on the east side of the main track.   He crawled under a coach at the point where the engine had left the track, and found a piece of switch point about six or eight inches long.   It was rusted at the bottom, and there was a new break about an inch or maybe a little more at the top. This piece of switch point was lying right where it had been broken off on the east side of the track.   This left a piece of the switch rail with a stub end.   When the train came to this stub end, the flanges of the wheels of the engine would naturally catch on this stub, and mount on top of the switch point.   This would cause the wheels to press down between the rails of the two tracks, and make what is known as a split switch. This would cause the engine to leave the track, and carry

with it the rest of the train. Willis left the piece of switch point which he found on the east side of the track on the switch stand which was on the left side of the track, and does not know what became of it.

It is true that several witnesses testified that the east switch point was not broken. Evidence was also adduced by the defendant tending to show that the engine could not have run 305 feet after it had left the track at the east switch point in question, and also to show that, even if the east switch point had been broken off as testified to by Willis, this would not have caused a split switch when the engine reached that point, and the wheels of it came upon the stub end of the switch rail. The testimony, however, of these witnesses does not go to the extent of showing that it was a physical impossibility that the engine could not have been run 305 feet after it left the track, and that the mounting of the engine wheels upon the stub end of the switch point could not have caused a split switch.

Willis testified that the appearance of the ground showed that the engine had left the track at the east switch point. He is corroborated in this fact by the attending circumstances. The engine and the derailed cars are all on the east side of the main track. The rails were torn up on the west side of the track at the point where Willis testified that the engine left the track. This would tend to show that as the engine left the track on the east side it pulled the cars in the direction in which it was going, and this would naturally tear up the rails on the west side of the track. It is true that the switch rail on the west side of the track was broken into three or four pieces, and one of these pieces about six or eight inches long was missing. The jury might have found, however, that, if the derailment of the train had been caused by the west switch rail breaking, the engine would naturally have dropped down on that side, and the wrecked engine and cars would have been on the west side, instead of the east side of the main track.

It is earnestly insisted that the piece of switch point testified to by Willis was a piece of the west switch rail. The undisputed evidence, however, shows that any railroad man of experience would know the difference between a switch point for the east rail and one for the west side of the track. This would be just as discernible as would be the difference between a right and left shoe. Besides this, Willis testified that he found the piece of switch point on the east side of the track right where it had broken off, and that it fitted into the stub end of the switch rail remaining there. It can not be said that it was a physical impossibility for the wheels of the engine to have mounted on the stub end of the switch point, and by pressing down upon the rails have caused a split switch. It is a reasonable inference that, if the switch point had not had a stub end, the wheels of the engine would have gone upon it smoothly, and there would have been no occasion for them to have exerted any pressure between the east rail of the main track and the east switch rail. On the other hand, if there was a stub end, the wheels would naturally mount the stub end with a jerk, and this might have the effect to pry apart the main rail and the switch rail, and thereby cause a split switch. In other words, when the wheels of the engine mounted the stub end of the switch point, the jury might have found that the sudden jar or jerk pried apart to a certain extent the rail on the main track and the switch rail, and that the continued downward pressure of the wheels of the engine and tender caused the opening between the rail on the main track and the switch rail to be further widened, and that the natural result of the continued pressure of the wheels at this point would be to cause a split switch and the consequent derailment of the engine or tender. The result of either of these running off of the main track or the switch track might carry with it the whole train. The fact that the engine, tender and derailed cars were found on the right side of the main track shows that the derailment was caused by some defect on that side of the track.

and the jury might have deduced as a legal inference from the evidence given for the plaintiff that the derailment was caused by the broken switch point on the east side of the track in the manner testified to by the witnesses for the plaintiff.

It is next insisted that the court erred in giving instruction No. 2, which reads as follows:

"In this case you will find from a preponderance of the evidence that the deceased, J. L. Pearson, was injured while in the employ of the defendant, St. Louis-San Francisco Railway Company, and while in the performance of his duty as a fireman on one of its engines, assisting in the operation of one of its passenger trains running from Fort Smith, Arkansas, to Springfield, Missouri, by the engine and some of the cars leaving the track near Meadows, in Crawford County, Arkansas, and that said injury was due to the fact that the east switch point on one of the rails of the switch had been broken after having been cracked and imperfect for a period of time, causing said train to derail, and that the condition of said switch point was known to the defendant, or could have been known to it before the accident, by its making a reasonably careful inspection of this switch point before the injury, and that the condition of the switch point was unknown to the deceased, J. L. Pearson, and that said defendant thereby was guilty of carelessness and negligence that caused the injury to the deceased, and that the defective condition of said switch point (if you find it was defective) was the proximate cause of the injury, you will be authorized to find for the plaintiff, and assess such damages as will fully compensate for said injuries to said deceased."

Counsel for the defendant made a specific objection to the instruction, because there is no evidence to support it. What we have just said with reference to the alleged error in refusing to instruct a verdict for the defendant answers this objection.

The second specific objection to the instruction is that it indirectly tells the jury by excluding certain other

allegations that this particular allegation has some evidence to support it. We do not think so. The court properly limited the consideration of the jury to the only ground of negligence relied upon by the plaintiff for a recovery, and it properly left it to the jury to determine whether the evidence established this ground of negligence.

The third objection to the instruction is that it is a comment on the evidence and leaves the jury to decide a question of law. What we have already said answers this objection.

Finally, the instruction is objected to because as a whole it is not a correct statement of the law under the pleadings and evidence in the case. This amounts to nothing more than a general objection to the instruction. Under this head, it is insisted that the instruction is erroneous because it uses the word "injury," instead of "death," with reference to J. L. Pearson. We can not see how any prejudice could have resulted to the defendant in this respect. The undisputed evidence shows that Pearson died as the result of the accident soon after it occurred. It is perfectly evident that the court used the word "injury" in its broadest sense, and that it included death. If counsel for the defendant thought otherwise, they should have made a specific objection to the instruction on this account, and, not having done so, it can not be said that the instruction was inherently wrong, calling for a reversal of the judgment under a general objection to the instruction.

It is also earnestly insisted that, under repeated decisions of the United States Supreme Court, the recovery in cases like this must be limited to compensating those relatives for whose benefit the administrator sues as are shown to have sustained some pecuniary loss; that the damages recoverable are limited to such loss as results to them because they have been deprived of a reasonable expectation of pecuniary benefits by the wrongful death of the injured employee. In short, that the damage is limited strictly to the financial loss thus sustained

*Michigan Central Rd. Co.* v. *Vreeland,* 227 U. S. 59; *American Railroad Co.* v. *Didrickson,* 227 U. S. 145; *Gulf, Colorado and Santa Fe Ry. Co.* v. *McGinnis,* 228 U. S. 173; *North Carolina Rd. Co.* v. *Zachary,* 232 U. S. 248; *Norfolk* v. *Western Ry. Co.* v. *Holbrook,* 235 U. S. 625; and *K. C. Sou. Ry. Co.* v. *Leslie,* 238 U. S. 599, and same case in 112 Ark. 305.

We do not think the instruction is subject to this interpretation and that it thereby violates the rule laid down by the Supreme Court of the United States.    It is not an instruction on the measure of damages at all. It is an instruction on the question of whether or not the defendant was guilty of negligence in the matter alleged by the plaintiff and relied upon for a recovery.

Instruction No. 3 immediately follows instruction No. 2, and is an instruction on the measure of damages.    It reads as follows:  ''If the jury find for the plaintiff they will assess damages for the widow, Eunice Pearson, and the minor children, Lloyd Pearson Jr., and Jack Edward Pearson, at such a sum of money as will reasonably compensate them for the loss of pecuniary benefits of which they were deprived by the death of J. L. Pearson, as is shown from the evidence in the case, reducing said sum to its present cash value.    Also you will assess further damages for the widow, Eunice Pearson, and the minor children, Lloyd Pearson, Jr., and Jack Edward Pearson, such a sum as will reasonably compensate for the physical pain and mental anguish suffered and endured by the deceased as a result of said accident, if any, from the time of the alleged injury until his death.''

It will be observed that this instruction on the measure of damages is in accord with the rule on the question announced by the Supreme Court of the United States in the cases just cited.  If counsel for the defendant thought that instruction No. 2 was likely to confuse or mislead the jury on this point, they should have made a specific objection to it on this ground.  The fact that they made several other specific objections tends to show that they did not think that instruction No. 2 was calcu-

lated to mislead the jury in the respect now contended for. When instruction No. 2 is read in connection with No. 3, which immediately follows it, we do not see how the jury could have been misled in the respect now contended for, and we are of the opinion that, having failed to make a specific objection to instruction No. 2, the defendant is not now in an attitude to complain. *St. L. I. M. & Sou. R. Co.* v. *Rogers,* 93 Ark. 564, and *Kelly Handle Co.* v. *Shanks,* 146 Ark. 208. Therefore we hold that this assignment of error is not well taken.

Under the Federal Employers' Liability Act it has been held that the right to recover for pecuniary loss to the widow and children and for conscious pain and suffering endured by the deceased may be had in one suit. *St. L. I. M. & S. R. Co.* v. *Craft,* 237 U. S. 648; and *K. C. S. R. Co.* v. *Leslie,* 238 U. S. 599.

It is next insisted by counsel for the defendant that the evidence is not legally sufficient to have warranted the court in submitting the question of conscious pain and suffering to the jury, and this we consider a very close question. S. C. Horn was the conductor of the train, and at the time of the derailment was in the front end of the head coach. That is to say, the car that has a mail end to it. After the derailment he went back and looked into all the coaches of the train to see whether or not any of the passengers were hurt. He did not find any one hurt, and then went up to the engine to see whether any of the employees were hurt. He found the engineer, who said that he was not hurt, and he then asked the mail clerk and baggage man. They replied that they were not, but told him that the fireman was injured. He then went to where they were getting the fireman out of the wreck, and he was alive. He just breathed a couple of times after the conductor got to him.

J. H. Hamilton was the principal witness for the plaintiff on this point. He was twenty-three years of age, and was attending the University of Arkansas, at Fayetteville. He had been to Dallas, Texas, and was on his way back to the University. The witness was asleep

in his berth when the accident occurred. He got up and dressed and went to the head of the train. He saw Pearson after he had been removed from under the engine. Pearson had very little life, yet he had life. His lips, mouth and tongue were white. He seemed to be badly scalded. We quote from his testimony the following:

"Q. What was his condition as you saw it at that time? A. Very little life, yet he had life. Q. Did you notice any effort on his part to speak, or what evidence of life did you see? A. He was breathing, trying to talk, or gasping for breath, and his lips and mouth were moving. Q. Was his tongue swollen out of his mouth? A. Swollen out some—looked like a bunch of cotton. Q. Do you know how long he lived? A. No, I left almost instantly. Q. How long would you say, from the time you first awakened and got up to the head of the train and saw Mr. Pearson. A. I don't remember. I was excited. I went the length of those cars. Q. What is your best judgment about the length of time, Mr. Hamilton? A. I would say between five and ten minutes. I don't know exactly."

C. R. Wilkins, another university student, was also a witness on this point. We quote from his testimony the following:

"Q. Did you see Mr. Pearson after he had been removed from the wreck? A. Yes sir. Q. What was his condition at that time? A. There was still some signs of life. He was moving his mouth and tongue—his chest made three or four moves. Q. In other words, he was breathing? A. He was trying to breathe; at least he made struggles. Q. Did you notice his condition, as to whether or not he was scalded or badly burned? A. Yes, because we was white at the time, and in a few minutes turned black as could be. Q. How long from the time you felt the impact until you arrived or saw Mr. Pearson after he had been taken out? A. Five or ten minutes, possibly it might have been longer. I don't think it was longer than ten minutes. Q. Did you remain there until Mr. Pearson died? A. He was dead

before I left, yes; a few seconds after I arrived he died.
Q. Was he scalded by the steam, and burned pretty
badly? A. I imagine he was scalded—he was burned
pretty badly.''

In determining the length of time Pearson lived after
being injured, the jury might have taken into considera-
tion the things done by the witnesses as well as their esti-
mates of time. Hence it might have found that Pear-
son lived longer than the period of time testified to by
the witnesses.

It is fairly inferable from the testimony of Hamilton
and Wilkins that Pearson died as the result of being
scalded by the escaping steam. From the nature of his
injuries and the description of his efforts to speak, the
jury might have legally inferred that he suffered great
agony in the short time he lived.

Both of the university students appear to have been
intelligent young men, and not to have had any interest
whatever in the present suit. Hamilton testified that
Pearson was breathing, trying to talk, or gasping for
breath, and that his lips and mouth were moving. We
think the jury might have legally inferred that Pearson
was conscious, and that he suffered conscious pain, and
not merely such pain as is incidental to death. It is true
that the length of time was short, but, when the testimony
is considered in the light most favorable to the plaintiff,
it can not be said that it was not legally sufficient upon
which to predicate an instruction on conscious pain and
suffering. *St. Louis S. W. Ry. Co.* v. *Rogers,* 166 Ark. 389.

It is next insisted that the verdict is excessive. Upon
this point the testimony shows that decedent was 36 years
of age, and had an earning capacity of $200 a month.
He had been working for the defendant for a number of
years. His personal expenses when away from home
amounted to between $25 and $30 per month. He left
surviving him his widow, one son nine years of age
and another who was born about six months after his
death. The testimony showed Pearson to have been a
very energetic man, and to be very devoted to his family.

He was in all respects a good citizen, and devoted his life and earnings to the support and care of his family. His life expectancy was shown to be 31.1 years. While the age of his wife was not shown, she was a witness in the case, and the jury could judge her age to some extent by her appearance, and other facts and circumstances in the record tend to show that she was a young woman. Under these circumstances it can not be said that the jury took into consideration something which they ought not to have taken, or failed to take into consideration something which they ought to have taken, in fixing the amount of damages.

Hence we do not think that it is a case where the verdict should be set aside merely on the ground that the damages appear excessive.

It is next insisted that the court erred in allowing a recovery for the benefit of J. E. Pearson, who was not born until six months after the death of his father. The Federal Employers' Liability Act gives a right of action in case of death to the personal representative, "for the benefit of the surviving widow or husband and children of said employee." We think it would be too narrow a construction to say that the children meant by the act were those living at the time of the death of the employee. But we think that the word "children," as used in the act, means all children who were the fruits of the marriage of the deceased employee and the surviving spouse, and who are dependent upon such employee. There would at least be as much necessity for providing for a child born after death as for those who are already in existence at the time of the death of such employee. The purpose of the statute was evidently to provide for those who were dependent upon the employee, and a child born after death would naturally fall within this class.

It is next insisted that the record shows that Eunice Pearson was appointed administratrix of the estate of J. L. Pearson, deceased, by the clerk in vacation, and that there can be no recovery because the record does not show that the vacation appointment was confirmed

by the probate court when it next convened.   Our statute provides that it shall be the duty of the courts of probate in term time, or the clerks thereof in vacation, subject to the confirmation or rejection of the court, to grant letters testamentary and of administration.   Crawford & Moses' Digest, § 4.

Letters of administration granted in vacation are not, under the terms of the statute, limited in point of time, so as to continue only to the succeeding term and then expire, unless confirmed by the court.   They are subject to the confirmation or rejection of the court, and it is the duty of the court to pass upon them; but they are valid until they are rejected.   *Potter* v. *Adams,* 24 Mo. 159; *Macey* v. *Stark,* 116 Mo. 481; and *Rayburn* v. *Rayburn* (Sup. Ct. of Appeals W. Va.), 12 S. E. 493.   After taking the oath, and giving bond as required by statute, Eunice Pearson became temporary administratrix of the estate of J. L. Pearson, deceased, and as administratrix of right as well as in fact, for the time being, she could exercise all the powers and perform all the duties required of her by law until her appointment was rejected by the probate court.

Again, it is insisted that no recovery can be had because the record shows that J. L. Pearson resided at Springfield, Missouri, at the time of his death.   That his death occurred in Crawford County, Ark., and the letters of administration were issued in Sebastian County, Ark. As we have already seen, the Federal Employers' Liability Act in the case of the death of an injured employee provides that the action may be brought by the personal representative for the benefit of the surviving widow or husband and children of such employee.   The existence of concurrent jurisdiction in the State courts is clearly established.   *Second Employers' Liability Cases,* 223 U. S. 1; *Kansas City Sou. Ry. Co.* v. *Leslie,* 238 U. S. 599; *St. L. & S. F. R. Co.* v. *Conarty,* 106 Ark. 421; and *Midland Valley Rd. Co.* v. *Lemoyne,* 104 Ark. 327.

An action to recover damages for wrongful death is a tort, and is not local but transitory, and can as a gen

eral rule be maintained wherever the wrongdoer can be found.  *Stewart'v. Baltimore and Ohio Rd. Co.,* 168 U. S. 445, and *Little Rock & Ft. Smith Ry. v. Townsend,* 41 Ark. 382.

The personal representative of the decedent is merely a nominal plaintiff, and the damages recovered are for the benefit of the surviving spouse and the children of the deceased employee.  The fruits of the judgment are distributed under the provisions of the statute in this case to the widow and children of the deceased employee. The relation of the administrator to the fund, when recovered, is not that of the representative of the deceased, but he is a mere trustee for the widow and children.  Hence there is no merit in the contention that the deceased was not a resident of the State of Arkansas or Sebastian County at the time of his death.

It follows that the judgment must be affirmed.