FORT SMITH, SUBIACO & ROCK ISLAND RAILROAD COMPANY
v. MOORE.

Opinion delivered December 13, 1926.

1. MASTER AND SERVANT—NEGLIGENCE—JURY QUESTION.—Whether defendant's engineer negligently backed a train at unusual speed, so as to cause a sudden jerk and throw the fireman under the tender, *held* under the evidence to be a question for the jury, in a suit under the Federal Employers' Liability Act (U. S. Comp. Stat. § § 8657-8665).

2. MASTER AND SERVANT—ASSUMED RISK—JURY QUESTION.—Whether the deceased fireman, killed by being thrown from a tender by a sudden jerk in making a coupling, had assumed, as a risk of his employment, the danger of falling in going back over the tender with a bucket of compound while the train was moving, *held* for the jury.

3. TRIAL—CONSTRUCTION OF INSTRUCTIONS.—An instruction that deceased fireman assumed the risk of injury from all ordinary dangers incident to his employment, but not from the danger arising from the negligence of the railroad's other employees, *held* not objectionable, when considered with other instructions, as taking from the jury consideration of whether the danger of going back over the tender while the train was in motion was so obvious that he must have known and appreciated it.

4. DEATH—WIDOW'S PECUNIARY LOSS.—An instruction as to the right of a widow to recover for her husband's death, under the Federal Employers' Liability Act (U. S. Comp. Stat. § § 8657-8665), *held* properly limited to pecuniary loss.

5. EVIDENCE—FORMER TESTIMONY.—Where one who testified on a former trial has since died, his testimony, on both direct and cross-examination, may be proved.

Appeal from Logan Court, Northern District; *James Cochran*, Judge; affirmed.

STATEMENT BY THE COURT.

William Moore, fireman, was killed while at his work on a mixed passenger and freight train at Ola, Arkansas, on October 11, 1922. This is the second appeal in the case. The judgment upon the former appeal was reversed because the court erred in submitting to the jury the negligence on the part of the brakeman in failing to give proper signals, or negligence in employing an unskillful and incompetent engineer, when there was no evidence

upon which to base instructions submitting these issues to the jury. *Fort Smith, Subiaco & Rock Island Rd. Co. v. Moore,* 166 Ark. 459, 266 S. W. 971. After the mandate of the Supreme Court was filed in the circuit court, an amended complaint was filed and the right to recover was limited to the issue of negligence on the part of the engineer in backing the train, at unusual speed, against some box-cars, which caused the fireman to fall from the tender. It was conceded on the retrial of the case that the suit was brought under the Federal Employers' Liability Act (U. S. Comp. Stat. §§ 8657-8665).

Fort Smith, Subiaco & Rock Island Railroad Company operates a line of railroads from Paris to Ola, Arkansas, and connects with the main line of the Chicago, Rock Island & Pacific Railway Company at Ola, and uses the same station and switch-yards at that point.

The train crew which was operating the train on the morning of the accident consisted of A. S. Hendrix, the conductor; E. J. Reed, the engineer; William Moore, the fireman; and Roy Scott and P. T. Little, the brakemen. On the morning in question, the west-bound passenger train on the main line of the Rock Island was due at 5:53 A. M. and the mixed train in question was due to go out at 7:15 A. M. The passenger train on the main line was late, and the crew on the mixed train endeavored to make up its train and take water at the tank on the main line of the Rock Island before going on the line of the defendant *en route* to Paris.

According to the testimony of the engineer, he backed his train on one of the sidetracks of the main line and fastened on to a string of cars and pulled them out on the main track. This was done for the purpose of setting out two cars which were wanted to be placed in the defendant's train. The string of cars, consisting of between 10 and 15 box-cars, was then pulled back from the main line onto one of the sidetracks.

P. T. Little was on one of the box-cars, giving signals to the switchman. These signals were repeated to the engineer by Roy Scott, who stood on the ground. The

sidetrack on which the string of cars was standing was down grade towards the east, and it was the intention of the train crew to connect them with four other cars attached to the engine and then shove the whole string of cars further east on the sidetrack so as to be in the clear of trains passing on the main track.

The engineer was looking out on the right-hand side of the cab, watching Scott giving the signals. As he made the coupling with four cars attached to the engine with the string of the cars on the sidetrack, he saw something at the back end of the tender drop out of sight, as he expressed it. The engineer immediately set the air-brake and shut off the air in the engine. The engine was going about two or three miles an hour, and did not go over three or four feet after the engineer applied the brake. The engineer then looked to see if he could see his fireman anywhere, and couldn't see anything of him. He went back to see if the fireman had climbed down the train further back, and did not see him. He then looked under the tender, and saw the fireman, three or four feet from the back end of the tender, under the first two wheels. The fireman was lying under the tender, against the sand-beam. The sandbeam had caught and twisted him on his side. One wheel had run over his leg just above the ankle.

The water in the tank at Ola was dirty and muddy, and a compound was used to keep it from foaming. It was the duty of the fireman to mix this compound in hot water drained from the boiler of the engine and to pour it in the tank on the tender when they took water. There was an opening at the back end of the tank to put the compound in. It was the duty of the fireman to mix the compound in a bucket on the engine, and, when the engine stopped to take water, to carry the compound in the bucket over the coal in the tender to the place where he would pour it in the water tank. It was the intention of the engineer to pull off of the main track of the Rock Island after he had pushed back the string of cars in the clear on the sidetrack, and had coupled the engine to the cars

on the main track which were to be attached to his train. The engineer could take water from the tank either while his train was on the main track or from the sidetrack on the other side of the tank. The bucket of compound was found on the top of the tender, and was within an inch of the top of the bucket. None of it had spilled out when the engineer had coupled the four cars attached to the engine to the string of cars on the sidetrack. No unusual jar or jerk was caused when the coupling was made.

The testimony of the engineer was corroborated by that of the two brakemen, Scott and Little.

According to the testimony of other witnesses for the plaintiff, the body of Moore was found under what was called the sandbeam, about six or eight feet from the rear of the tender. He was twisted under it. His body was found right where the main line joined the sidetrack. One of Moore's gloves, containing some of his finger nails and bits of his fingers, was found between fifteen and twenty feet west of where he was taken out from under the tender. The glove was on the right side of the rail and south of it. Moore's body looked to be torn up, and his clothing was badly torn. His body looked like he had been turned over and over. The cinders and dirt had been rubbed into his wounds. Some blood was found on the rails about two and a-half rails' length west of where Moore's body was found under the tender.

Another witness testified that the body of Moore had been dragged down the track through the cinders and dirt. He saw blood about twenty or thirty feet up the track, while he was looking for the fingers which showed to have been cut off of Moore's hand. He said that Moore was mangled just the same as a dog, and his overalls were like they had been dipped in a tub of blood and cinders. His body appeared to be all covered with cinders, and his face was swollen and black.

Evidence was introduced by the defendant tending to show that it was dangerous for a fireman to go over a tender filled with coal while the train was in motion. Other evidence was also introduced by the defendant

tending to show that there was no negligence in the operation of the train at the time Moore was killed.

The jury returned a verdict for the plaintiff in the sum of $5,000, and from the judgment rendered the defendant has duly prosecuted an appeal to this court.

*James B. McDonough,* for appellant.

*Evans & Evans* and *White & White,* for appellee.

HART, J., (after stating the facts). As above stated, it was conceded by counsel for the plaintiff that the suit was brought under the Federal Employers' Liability Act, and that the plaintiff's right to recover was based upon that act.

Upon the former appeal it was earnestly insisted that the defendant was not guilty of negligence in any respect. This court, under the facts proved at the first trial, held that, under the evidence of the plaintiff, the jury might find that the negligence of the engineer consisted in backing the engine and tender with the four cars attached thereto against the string of cars on the sidetrack at unusual speed, which caused a sudden jerk in the operation of the train and threw Moore from the tender, and thereby caused the wheels of it to run over him and crush him to death under the sandbeam of the tender.

The engineer testified on the first trial, as he did on the retrial of the case, that the engine and tender were only running at the rate of two or three miles per hour, and that he stopped the train within three feet after he applied the airbrake. As we said upon the former appeal, the jury might have found that the engineer's testimony and that of the brakeman on this point was not wholly true. The evidence shows that Moore was a stout, active man, only thirty-one years of age, and it is not likely that he would have fallen under the wheels of the tender if it had only been going at the rate of two or three miles an hour and had been stopped within three feet. It will be remembered that the engineer testified that he saw something going over the tender, and immediately applied the brake. He then went back to look for his fireman. The jury might have inferred from this that the engineer saw

the fireman fall from the rear end of the tender and knew
that he would likely be hurt, for he immediately went
back to look for him. The condition of Moore's body and
the fact that cinders and earth appeared to have been
rubbed into his wounds indicated that he was dragged for
some distance after he fell from the tender. One of his
gloves, with the ends of some of his fingers in it, was
found about fifteen feet west of where his body was found.
Some blood was found on the rails still further west.
This indicated that Moore's body was carried under the
tender for a much greater distance than three feet.

The jury might have accepted that part of the engi-
neer's testimony which showed that he saw something fall
from the back of the tender, and immediately stopped his
train and went back to see if it was not his fireman.
When he went back, he did find the body of the fireman,
all mangled, under the tender. From this evidence the
jury was warranted in finding that the mangled condition
of the body of the fireman, the fact that his glove with
bits of finger in it was found fifteen feet west of where
his body was, and the further fact that blood was found
on the tracks still further west, indicated that the train
was going at a much greater rate of speed than that tes-
tified to by the witness, and that, on account of the
unusual rate of speed, the impact with the string of cars
on the sidetrack was much greater. The jury might have
inferred from the testimony that the fireman believed
that the engineer would make the coupling just as he tes-
tified that he did make it, and that he felt that he could,
with safety, go back over the tender with the bucket of
compound and be ready to pour it in the tank when the
engineer was ready to take water, and that, by reason of
the coupling being made with an unexpected and unusual
jerk or jar caused by the engineer running the engine and
tender at an unusual rate of speed, the fireman lost his
balance and fell from the tender.

It is contended, however, that the undisputed proof
shows that the bucket of compound was filled within an
inch of the top, and that none of it had spilled out, which

would have happened had the coupling been made at an unusual rate of speed or had it been accompanied by a sudden jerk. While the engineer and other witnesses testified that none of the bucket of compound appeared to have been spilled, this might not have been accepted by the jury as undisputed evidence. The question of whether any of the bucket of compound had spilled depended upon the recollection of the engineer and the other witnesses on that point. The jury might have found from the attendant circumstances that they had testified falsely on that point, intentionally, or perhaps due to a faulty memory. In other words, the undisputed facts show that the fireman was found with his body crushed and mangled under the tender, and that the engineer thought he saw something fall off of the rear end of the tender. In any event, he saw something fall off, and was so of the opinion that it was the fireman that he immediately applied the airbrake and stopped the train. The jury might have inferred, as above stated, that this was caused by a sudden and unexpected jerk in making the coupling, and that some of the compound did spill out of the bucket, although the engineer testified to the contrary.

It cannot be said as a matter of law that the fireman assumed the risk of going back over the tender with a bucket of compound while the train was moving. The jury might have inferred that the fireman believed that the coupling would be made in the usual way and would be attended by no danger to him, but, due to the fact that he was in a hurry, the engineer ran the engine and tender with the four cars attached to it at a much greater speed than he thought he was, or at least at much greater speed than he testified to, and thereby caused a sudden and unexpected jar or jerk of violence when the cars ran against the string of cars on the track. Therefore we think the question of the negligence of the defendant and the assumption of risk by the fireman were proper questions of fact to be submitted to the jury for its determination.

It is next contended that the court erred in instructing the jury on the subject of assumption of risk. The court gave instructions Nos. 5 and 6, which are as follows:

"5.    The deceased, Will Moore, by engaging in the defendant's service, assumed the risk of injury from all the ordinary and usual dangers and hazards incident to the employment in which he was engaged, but he did not thereby assume the risks of injury from any danger or hazard arising from the negligence of the other employees of the defendant.

"6. Before the deceased can be held to have assumed the risk of injury from any danger or hazard arising from the negligence of any of defendant's other employees, it must appear from a preponderance of the evidence that deceased knew of such negligence and appreciated the danger therefrom to himself, or that the danger from such negligence to deceased was so obvious that the deceased, in the exercise of ordinary care for his own safety at the time, must have known of such negligence, and appreciated the danger to himself therefrom."

Counsel for the defendant insists that these should be treated as separate instructions, and that number 5 is erroneous because it takes away from the jury the consideration of whether, under the facts, the danger was so obvious and patent that the fireman must have known and appreciated it. It will be observed that these two instructions follow each other; and, from the language used, it is apparent that they should be read together, and, when so read together, they harmonize with each other. We cannot see how the jury could have been misled when the two instructions were read and considered together. Each one supplements the other, and they were doubtless so understood by the jury as well as by the counsel for the respective parties in their arguments to the jury. *St. L. I. M. & S. R. Co.* v. *Rogers*, 93 Ark. 564, 126 S. W. 375; *Kelly Handle Co.* v. *Shanks*, 146 Ark. 208, 225 S. W. 302; and *St. L. S. F. R. Co.* v. *Pearson*, 170 Ark. 842, 281 S. W. 910.

It is next insisted that the court erred in giving instruction number 12, which reads as follows:

"If you find for the plaintiff, but do not find that the deceased was guilty of contributory negligence, you will fix the amount of her recovery at such sum as, in your judgment, from the evidence, will fairly compensate her, as the widow of the deceased, for the pecuniary loss, if any, which she has sustained by reason of the death of her husband, such amount not to exceed the amount sued for herein. In fixing such amount you may take into consideration her husband's age, health, expectancy of life, and his earning power, and also the contributions, if any, which she might reasonably expect from her husband had be survived. If you find for plaintiff, and further find that her husband was guilty of some contributory negligence, you will reduce the damages recoverable by the plaintiff in proportion to the amount of negligence attributable to the deceased."

Counsel for the defendant insists that this instruction is contrary to the rule laid down by the Supreme Court of the United States in *Kansas City Sou. Ry. Co.* v. *Leslie,* 238 U. S. 599, and other cases on the subject. We do not agree with counsel in this contention. The language used in the instruction shows that the court expressly limited the right of the widow as a beneficiary entitled to recover to her actual pecuniary loss. The instruction is in accord with the rule on the subject laid down by the Supreme Court of the United States in the cases cited in *St. L.-S. F. R. Co.* v. *Pearson,* 170 Ark. 842, 281 S. W. 910, to which reference is here made, that the damages to be recovered by the widow are limited strictly to the financial loss sustained by her.

Error is assigned in giving other instructions by the court and in refusing some asked by the defendant. We do not deem these assignments, however, of sufficient importance to warrant a separate discussion. It is sufficient to say that we have carefully considered them, and find them not well taken. The instructions given by the

court fully and fairly submitted to the jury the respective theories of the parties.

Finally, it is insisted that the court erred in allowing the plaintiff to give the testimony of Frank S. Johnson as shown by the bill of exceptions on the former appeal. There was no error in this respect. Johnson was a witness for the plaintiff on the former trial, and was examined and cross-examined at length. His testimony was taken down by the court stenographer in shorthand and transcribed by him in the bill of exceptions. Johnson has since died. Where it is shown that a witness is dead, his testimony given at the former trial between the same parties should be received as evidence. *Railway Co.* v. *Sweet,* 60 Ark. 550, 31 S. W. 571.

But it is insisted that the court erred in allowing the cross-examination of Johnson to be read to the jury. There was no error in this. *Vaughan* v. *State,* 58 Ark. 353, 24 S. W. 885. In that case the cross-examination as well as the examination was held to be competent.

We find no reversible error in the record, and the judgment will therefore be affirmed.