MISSOURI PACIFIC RAILROAD COMPANY *v.* REMEL.

Opinion delivered April 11, 1932.

*Thomas B. Pryor* and *Daggett & Daggett,* for appellant.

*Pace & Davis,* for appellee.

MEHAFFY, J. The appellee on June 3, 1930, was in the employ of the appellant as a brakeman on a freight train running from North Little Rock, Arkansas, to Pop-

lar Bluff, Missouri. While in the service of appellant as such brakeman, he was engaged in switching a part of the train at Newport, Arkansas, and was thrown from one of the cars and injured.

The appellee was at the time of the injury engaged in interstate commerce and was assisting in operating a train which was carrying interstate commerce, and the suit was therefore brought under the Federal Employers' Liability Act, and a recovery for his injury sought under the provisions of that act.

Appellee alleged that he was injured by the carelessness and negligence of the appellant; that there were about 60 cars in the train when it reached Newport, Arkansas; the train headed in on a side track, cut off about 35 cars, went through a switch at the north end of the passing track out on the main track.

It was discovered that the main line was occupied, and it became necessary to back the 35 cars again into the passing track.

The appellee, in the performance of his duty, was riding on the last car to protect the train as it backed into the passing track. It was alleged that, on account of the carelessness and negligence of the engineer, E. J. Zimmerman, in stopping the train in an unusual and violent manner, appellee was thrown from said car to the ground, and injured in such a way that he will never be able to do or perform manual labor.

He was thrown with such violence and force that it resulted in an injury to his spine, spinal column, and spinal cord, crushing and breaking, among other injuries to the spine, the first lumbar vertebra, thereby obliterating the space between the first and second lumbar vertebrae, also narrowing the space between the first lumbar and the vertebra above it, causing said spinal column to become displaced and out of line at and below the place of injury, also injuring and producing a malformation of the second lumbar vertebra, also otherwise fracturing and injuring the second, third, and fourth lumbar vertebrae, fracturing the ninth and eleventh ribs on the left

side, resulting in a paralysis of the bladder and bowels and other organs of the body, including his lower limbs. His nervous system was shattered, his injuries making a permanent physical wreck of him.

At the time he received the injury, he suffered great and excruciating pain of body and anguish of mind, and will continue to so suffer throughout the remainder of his life. At the time he was injured he was 39 years of age, was strong and able to perform, and was performing, hard manual labor for a livelihood, and was earning $250 per month; that, on account of said injury, he will not be able to do or perform labor of any kind in the future; that he had been damaged in the sum of $75,000, for which he prayed judgment.

The appellant answered, denying all the material allegations in the complaint as to negligence, and as to his injuries, and interposing the defenses of contributory negligence and assumption of risk.

At the trial it was admitted that the appellant is a corporation; that it was engaged in interstate commerce at the time of the alleged injuries, and that the appellee was engaged in interstate commerce at the time of the accident:

There was a verdict and judgment for $60,000, and this appeal is prosecuted to reverse said judgment.

The appellant's first contention is that the evidence is insufficient to sustain the verdict in favor of appellee, and that the court erred in refusing to give appellant's instruction No. 1, which instruction directed a verdict for the appellant. Appellant states that, under the Federal Employers' Liability Act, Congress took possession of the field of employer's liability to employees engaged in interstate commerce by rail; that all State laws on the subject are superseded, and that the rights and obligations of every plaintiff invoking the provisions of the act are dependent upon it and applicable principles of common law as interpreted by Federal courts, and that therefore the character and sufficiency of evidence to establish negligence is not subject to control of the State.

It is argued that the injury complained of must have resulted in whole or in part from the negligence of one or more of the employees, and that proof of such negligence is essential to recovery. This statement of the law by appellant is correct.

This court, in a recent case, said: "This suit is brought under the Federal Employers' Liability Act, and, since this act does not define negligence, the question of whether the acts complained of amount to negligence, is to be determined according to the common law, and according to the rules prevailing in the Federal courts as to what constitutes negligence under the common law. However, there is no difference between the decisions of the Federal court and of this court as to what constitutes negligence." *Mo. Pac. Rd. Co.* v. *Skipper,* 174 Ark. 1083, 298 S. W. 849; *St. L.-San Francisco Ry. Co* v. *Smith,* 179 Ark. 1015, 19 S. W. (2d) 1102.

In the case of *St. L.-S. F. Ry. Co.* v. *Smith, supra,* relied on by appellant, it is stated that the rule governing the State courts is well stated in the case of *C. M. & St. P. Ry. Co.* v. *Coogan,* 271 U. S. 472, 46 S. Ct. 564. The Supreme Court of the United States in that case said: "It follows that, unless the evidence is sufficient to warrant a finding that the death resulted from the catching of deceased's left foot under the bent part of the pipe line, the judgment cannot be sustained. As there is no direct evidence, it is necessary to determine whether the circumstances are sufficient to warrant a finding of that fact. Whenever circumstantial evidence is relied on to prove a fact, the circumstances must be proved, and not themselves presumed. * * * The fact that deceased was run over and killed at the time and place disclosed has no tendency to show that his foot was caught. * * * The record leaves the matter in the realm of speculation and conjecture. That is not enough."

Neither this court nor the Supreme Court of the United States will sustain a verdict based on speculation and conjecture.

The evidence in this case shows that the appellee was about forty years of age at the time of the trial, had been in the service of the appellant since 1910, and had been in the service altogether about 23 years, 21 of which he was a brakeman. At the time of his injury, he was swing brakeman on a train of about sixty cars, and rode the engine from Bald Knob to Newport. When the train went into the passing track at Newport, according to his testimony, he got off the engine and caught back at the last car. The train pulled up in the passing track and stopped, clearing the crossing. After cutting off the cars, the train pulled up at the north end of the yard. Appellee was on the rear car with his right foot in the stirrup. The train could not get out far enough to get the rear car of the cut by the switch, so they could shove them into track 3. When the engineer stopped, appellee got off the car on the ground and walked around the end of the car. The engineer blew three short blasts of the whistle, meaning that he was going to back up, and then appellee looked around and could not see any one. Appellee got on the rear car to keep any one from being injured by backing up. He does not know exactly how far he backed, but he says that all at once a jar and a noise and all came together, and he was thrown doubled up in a knot, and fell on the rail ahead of the cars. He was riding on the last car from the engine with his right foot in the stirrup and left foot on the end of the grab-iron, and when the jar came, it all came at once. He tried to stay on, but was jerked off on the ground.

He was at the time where his duty required him to be. The train did not make an ordinary stop, but a very violent one, and he testified that he knew the engineer did not use the right brake on that cut of cars. Trains like that are equipped with two brakes, an independent and an automatic brake. The independent brake affects the engine and tender only; the automatic brake affects the whole train. The automatic brake should be used in operating a train with 35 cars. If used, it sets the brakes on all the cars at the same time. All the brakes take

hold at the same time. The purpose of using the automatic brakes is to avoid jerking and hard stopping. If the independent brake is used, it will make a hard stop and jerk. It glues the engine to the rail, and the cars go along by themselves, and, of course, when they get to the last car, they will surely jerk like a whip.

Appellee could tell from the way the cars were stopped that the stop had been made by the use of the independent brake. If the automatic brake had been used, it would have applied the brake on the entire cut of cars.

When the independent brake was applied, the cars ran out as long as there was slack, and then jerked back. That was what threw him off. Appellee said at the time the cars were moving when he got on more rapidly than he was walking. They were moving at about the rate of five miles an hour. There is a difference in the action of the train when the independent brake is used from its action when the automatic brake is used.

Appellee testified that he had a right to believe that the engineer would handle the train so as not to jar him off, and that the engineer should have done so; that it was his duty to do so, but he did not do it; that appellee had no reason to suspect that he would stop as he did.

Appellee also testified that it was not the custom and not usual and proper to stop the train violently like it was stopped when he was injured.

H. L. Walker testified that he worked for the appellant from 1919 to 1928 as switchman and brakeman; that he was familiar with the character of trains and engines that appellee worked on. The engine was the heaviest type of freight engine running into Little Rock. He testified at length about the rules with reference to stopping trains, and said that the rules required that, when stopping a long train, while backing at a moderate or low speed, to use a light reduction; keep the engine brakes from applying, and continue to use steam. The object is to prevent the slack from running out harshly. He testified the easiest way to control a train is with the automatic brake. The engine brake applies only on the

engine and tender; that the use of the independent brake in backing a train of 35 cars would make a severe stop, and the further it goes back, the more severe it is, and the last car gets the hardest jolt; it is a violent stop, and that is not the ordinary way to stop a train.

This witness testified at length about the use of the automatic brake and independent brake, and when asked if he would not expect the use of the independent brake ordinarily in that kind of movements, he answered that he would not when they had the air lined up, because it is a very severe jolt. He was then asked: "But ordinarily he would?" and he answered, "No, sir; ordinarily he would not."

M. Dumas, a witness, also testified that he had been in the service of the Missouri Pacific for 12 years, but that he was not employed now. He is familiar with the character of engines and trains used on through freights. He testified as to the effect of the use of the independent brake, and said it would be awful severe; that it would be hard to stay on; would be dangerous, it would come with such a jerk. He testified that he would not expect the engineer to stop the train, such a train as appellee was injured on, with an independent brake; that they were not supposed to use the independent brake except in emergency cases.

J. W. Bernard, employed by the Missouri Pacific from 1899 to 1929, testified that he was familiar with the kind of service being performed at the time of the accident, and that the proper brake for the engineer to use was the automatic; that stopping with the independent was very severe. He was asked: "When you have your train, and the air is coupled up through the train, the instructions are to use the automatic brake?" and he answered, "Yes, sir." He stated that the way to use an independent brake to stop a train was to apply it very gradually, and give it time to let the slack run out easily. If you jam on the independent brake, the slack will run out suddenly and jerk the rear end.

P. G. Steed, another witness, formerly employed by appellant as locomotive fireman and engineer, testified that in a back-up movement involving 35 cars, the engineer should use the automatic brake. In such movement it was the duty of the brakeman to be on the last car, and the engineer should know he was there. He testified on cross-examination that, when the air is coupled up, the automatic must be used; that you would use the independent brake handling a light engine or a very light bunch of cars.

E. J. Zimmerman testified for the appellant that he was the engineer at the time of the accident, and used the independent brake in making the stop; that he made a light application and then made a further application and stopped. He and a number of witnesses testified that the stop made at the time of appellee's injury was the ordinary stop, and, in effect, that it was not negligence.

Appellant says that the case of *Ft. Smith S. & R. I. Rd. Co.* v. *Moore,* 172 Ark. 353, 289 S. W. 6, was reversed by the Supreme Court of the United States on the authority of *C. M. & St. P.* v. *Coogan.* The Supreme Court of the United States, in reversing the case, stated that it was reversed on authority of *Gulf, Mobile & No. Rd. Co.* v. *Wells,* 275 U. S. 455, 48 S. Ct. 151, and *C. M. & St. P. Rd. Co.* v. *Coogan.* We have already called attention to the Coogan case.

In the other case given as authority for reversal of the Moore case, the Supreme Court of the United States expressly stated that there was no evidence that the engineer knew or should have known that Wells was not on the train, but was attempting to get on after it had started, and was in a situation in which a jerk of the train would be dangerous to him.

In the instant case, the engineer knew where appellee was, and knew he was in a situation in which a jerk of the train might be dangerous.

The court also said, in the Wells case, that the statement that there was a jerk was mere conjecture, and the court, continuing, said: "In short, we find that, on the

evidence and all the inferences which the jury might reasonably draw therefrom, taken most strongly against the railroad company, the contention that the injury was caused by the negligence of the engineer is without any substantial support. In no respect does the record do more than leave the matter in the realm of speculation and conjecture.''

In the instant case there is evidence to the effect that the automatic brake should have been used, and that appellee was where his duty required him to be, on the last car, and that the engineer knew he was there. There is therefore substantial evidence of the negligence of the engineer causing the injury to appellee. A verdict will not be sustained either by the Supreme Court of the United States or this court on speculation or conjecture, nor where there is only a scintilla of evidence, but the rule in both courts is that there must be substantial evidence upon which to base the verdict. It is also the rule, not only in this court, but in the Supreme Court of the United States, that, if there is substantial evidence, it is then a question for the jury, and the rule in both courts also is that the burden is upon the plaintiff to prove negligence, and also that the negligence was the cause of the injury.

Appellant calls attention to many authorities to the effect that proof of negligence proximately causing the injury is a prerequisite to recovery. This court has always held that the burden is on the plaintiff, not only to prove negligence, but that the negligence caused the injury.

We have not set out the evidence in detail, but have referred to it sufficiently to show that there was substantial evidence upon which to base the verdict.

In this case, as we have already said, there is evidence tending to show that the engineer was guilty of negligence, which caused the injury, and nothing need therefore be said about the doctrine of res ipsa loquitur.

It is next contended that the appellee cannot recover because he assumed the risk. If the evidence of the witnesses that it was improper to use the independent brake

instead of the automatic, and that this independent brake was applied suddenly, so as to cause a violent jerk, when the stop could have been made in the ordinary way, then of course the appellee did not assume the risk. An employee does not assume the risk of the negligence of the master or its servant, the engineer. In fact, the act under which this suit is brought authorizes a recovery if the injury is caused in whole or in part by the negligence of the master or its servants. The employee would not assume the risk of the negligence of the master unless he knew of its existence.

According to the evidence of the appellee, he was in a perilous position, and the engineer knew it. Of course, the evidence on the part of the appellant is in conflict with this, but, wherever the evidence is in conflict, its weight and the credibility of the witnesses are questions for the jury.

The question of a continuance or a postponement of the case was within the sound discretion of the trial court, and it does not appear in this case that the court abused its discretion. The appellant knew about the evidence that it wanted in ample time to have been prepared with its evidence, and it was during the progress of the trial that appellant asked for the postponement, and asked that plaintiff be directed to send a telegram to the Mayo Clinic.

This court has often held that the granting or refusing a postponement is within the sound discretion of the trial court, and the manner of procedure and the rules regulating the conduct of a lawsuit must necessarily be largely within the discretion of the trial court.

It is finally contended by the appellant that the verdict of the jury is excessive. Appellee was 39 years of age, was healthy and strong, and able to work all the time, and was earning $250 per month. He had been working for the company for a number of years; was in the hospital for a long while; the injury was very painful; appellee cannot sleep the whole night through, or do any work, and has been confined to his house for

a long while; he has no control over his bowels or urine, and no feeling in that part of his body; he never had any trouble with his bladder or urine before, or his bowels, and it appears from the evidence that he will not only be unable to perform any work and earn anything in the future, but that he will necessarily suffer pain and inconvenience for the rest of his life.

He has a fractured spine, the first lumbar vertebra is badly crushed, and his spinal cord pinched. Some of his ribs were broken, and as a result of the injury he has no feeling in the lower part of his body, and no control over his kidneys or bowels.

The evidence of the physician was to the effect that he would never be any better, but gradually grow worse, without hope of recovery, and that he will continue to suffer pain.

The amount of recovery in a case of this sort should be such, as nearly as can be, to compensate the injured party for his injury. The suit is for compensation, and compensation means that which constitutes or is regarded as an equivalent or recompense; that which compensates for loss or privation remuneration.

It appears from the evidence that the injuries received are very severe. However, the undisputed evidence shows that in 1914 or 1915 the appellee was severely injured in an accident and was at that time in the hospital several months, receiving treatment for his injuries.

There is evidence tending to show that his injuries at that time were severe, and resulted in the loss of control of bowels and bladder, and partial paralysis from the waist down. He afterwards gained control of the bowels and partial control of the bladder. There was some evidence tending to show that the injury received in 1914 or 1915 affected his spine.

We have considered carefully all the evidence with reference to his injuries, and have reached the conclusion that a judgment for $60,000 is excessive, and that it should be reduced to $40,000.

The judgment is therefore reduced to $40,000, and affirmed for that amount.