**Sam H. JOHNSON, Plaintiff-Appellee,**

v.

**PENROD DRILLING COMPANY, Defendant-Appellant.**

**James L. STARNES, Plaintiff-Appellee,**

v.

**PENROD DRILLING COMPANY, Defendant-Appellant.**

**Nos. 71–2243, 71–2245.**

United States Court of Appeals, Fifth Circuit.

March 21, 1975.

Rehearing En Banc Denied May 1, 1975.

---

John M. Smith, Longview, Tex., Warren M. Faris, Mat M. Gray, III, New Orleans, La., Sam B. Hall, Jr., Marshall, Tex., Joseph W. Milner, Shreveport, La., for defendant-appellant.

Scott Baldwin, Marshall, Tex., Joseph D. Jamail, S. Gus Kolius, Houston, Tex., for plaintiffs-appellees.

E. D. Vickery, Houston, Tex., amicus curiae, for West Gulf Maritime Assn.

Francis H. Hare, Birmingham, Ala., amicus curiae, for Alabama Trial Lawyers Assn.

Benjamin W. Yancey, Edward S. Bagley, New Orleans, La., amicus curiae, for New Orleans Steamship Assn.

William R. Edwards, Corpus Christi, Tex., amicus curiae, for Texas Trial Lawyers Assn.

W. James Kronzer, pro se, amicus curiae.

Samuel C. Gainsburgh, New Orleans, La., amicus curiae, for Kierr, Gainsburgh & Benjamin.

Royce R. Till, Sim T. Lake, Houston, Tex., amicus curiae, for Fulbright, Crooker & Jaworski.

James E. Clark, Birmingham, Ala., amicus curiae, for Alabama Defense Lawyers Assn.

Royal H. Brin, Jr., Dallas, Tex., amicus curiae, for Texas Assn. of Defense Counsel.

Arthur J. Mandell, Houston, Tex., Marvin I. Barish, Philadelphia, Pa., amicus curiae, for Assoc. of Trial Lawyers of America.

George A. Frilot, III, New Orleans, La., amicus curiae, for Survivors of U.S. Coast Guardmen who Lost Their Lives Aboard the Buoy Tender White Alder.

Thomas F. Lambert, Jr., Boston, Mass., Tully R. Florey, III, Mt. Pleasant, Tex., amicus curiae.

## ON REHEARING EN BANC

Before BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, RONEY and GEE, Circuit Judges.

PER CURIAM:

### I  JURY TRIAL

On the jury trial issue, the en banc court adopts the original panel opinion by Judge Simpson in this case, reported at 5 Cir., 469 F.2d 897.

### II  INFLATION

On November 21, 1972 an opinion by Judge Simpson for the panel was released to the parties and was reprinted in the advance sheets of the Federal Reporter, Second Series. The opinion released on that date contained an extensive discussion of the inflation issue. On petition for rehearing, March 29, 1973, the discussion of inflation in the initial opinion was modified and abbreviated to the language set out at 469 F.2d 904–5.

The court en banc now adopts that portion of the full initial panel opinion as released on November 21, 1972, entitled "PROCEEDINGS FOLLOWING REMAND". To facilitate reference thereto, the unpublished portion of that opinion is appended here.

■■ We judicially notice that inflationary conditions in this nation's economy have worsened in the interim between the November 21, 1972 panel opinion and today and we recognize that this accelerating rate of inflation increases the likelihood that inflation could become a predictable condition for the future. Nevertheless, with this added light, we still cannot so surely discern the shadow of inflation as a coming event as to warrant requiring its inclusion in a present rule for calculating future damages. The worsening of inflation might as readily foretell a recession or a depression as its continuity. Strong governmental counter-measures have been proposed and their efficacy is still unknown. Then too, if future inflation does cause higher wages, experience predictably demonstrates that higher interest rates on investments which have always accompanied inflation will also occur and this factor will mitigate the failure to include an inflationary surcharge in wage rate calculations. In addition to the Second and Sixth Circuit decisions cited in Judge Simpson's opinion, we note that three other circuits appear to agree with this procedure.[1] Cunningham v. Bay Drilling Company, 421 F.2d 1398 (5th Cir. 1970) is overruled. To the extent that Canal Barge Company, Inc. v. Griffith, 480 F.2d 11 (5th. Cir. 1973) announced a contrary view, that opinion cannot stand.[2]

## III INCOME TAX

■ In addition, the court en banc has considered whether on remand the juries in these causes should be permitted to consider evidence and be given an instruction on the impact of income taxes on their calculations of a proper award for loss of future wages. Allowing this subject matter to be considered would require the admission of expert opinion evidence as to what future income tax rates and deductions are expected as well as opinion evidence on what current rates and deductions would be applicable to the subject wage earner during various phases of the jury's future loss calculations. Of necessity, this evidence would have to be accompanied by an instruction from the court as to the application of these rates to such untaxable compensatory elements (and, in some cases, such taxable punitive damage ele-

1. 1st Cir. Williams v. United States, 435 F.2d 804 (1st Cir. 1970).

3rd Cir. Frankel v. Heym, 321 F.Supp. 1331 (E.D.Pa.1970), aff'd, 466 F.2d 1226 (3rd Cir. 1972). At p. 1346 the District Court stated:
The projected inflationary trend is speculation. Plaintiff has used the decade of the 1960's, one of the more inflationary times in the history of our country, as the basis for a projection of over fifty years. It is common knowledge that our Government is and has been attempting to control inflation, even to the point of considering wage and price controls. Economists differ on their predictions. Moreover, plaintiff will have money that can be invested and if inflation continues, the return on the money will be greater, and this would have an offsetting effect.
9th Cir. Furumizo v. United States, 245 F.Supp. 981 (D.Hawaii, 1965), aff'd, 381 F.2d 965 (9th Cir. 1967). In upholding the trial court's refusal to consider inflation, the circuit court stated: "Moreover, the period here in question is 34.6 years . . . and this court knows that less than that long ago there was a period of severe deflation." Id. at 971. But see the per curiam in Mills v. Tucker, 499 F.2d 866 (9th Cir. 1974), which states in dictum that the trial court may have been in error in failing to fully account for inflation. See also Yodice v. Koninklijke Nederlandsche Stoom. Maat., 443 F.2d 76 (2nd Cir. 1971), cert. denied, 411 U.S. 933, 93 S.Ct. 1902, 36 L.Ed.2d 393 (1973); and Petition of United States Steel Corp., 436 F.2d 1256 (6th Cir. 1970), cert. denied, 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971), cert. denied, 402 U.S. 987, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971), cert. denied, 402 U.S. 987, 91 S.Ct. 1665, 29 L.Ed.2d 153 (1971), reh. denied, 403 U.S. 924, 91 S.Ct. 2227, 29 L.Ed.2d 703, reh. denied, 403 U.S. 940, 91 S.Ct. 2247, 29 L.Ed.2d 720 (1971).

2. On rehearing, the panel in Canal Barge stayed its mandate and deferred consideration of this issue pending our en banc action. 480 F.2d at 34.

ments) as may be involved in the verdict. To compound the complexity and the jury's difficulty in reducing the proof to a monetary award, the tax effect of contingent attorneys' fees and the taxability of the interest earnings under the annuity principle used to calculate the reduced present value of future wages would have to be analyzed. As a judgmental matter and consistent with our views on inflation, in a case such as those at bar in which the annual wage rate involved (here 8,646.40 and 11,387.10 dollars) is subject to an income tax rate which would not distort projections or result in a windfall recovery, we conclude that justice is better served if these contingencies, variables and predictions are withheld from the jury's consideration.[3]

## IV CONCLUSION

The rule on remand thus becomes closely similar to that announced by the panel in Blue v. Western Railway of Alabama, 469 F.2d 487 (5th Cir. 1972).[4] Evidence to be adduced on the issue of future loss of earnings should be the predicted gross earnings lost due to defendant's wrong or neglect, without adjustment for taxes, calculated over the projected work-life of the injured party. The evidence of gross earnings should expressly indicate that the proof adduced relates to total earnings rather than to the more familiar "take-home" pay. An instruction by the court may also make this condition clear if it is deemed necessary to avoid the possibility of duplication of the tax element in any award.

*Blue* required the use of an interest rate to reduce future wages to current value which was projected as appropriate "over the period of the remaining work-life of the plaintiff". To attain the desired simplicity and efficiency of trial procedures, we recede from this portion of that decision. The calculated gross future earnings must be reduced to present value by the use of an appropriate interest rate prevailing at the time and place of trial.

The judgments of the district court in both No. 71–2243 and No. 71–2245 are reversed and the causes are remanded for further proceedings consistent with this opinion.

Reversed and remanded.

## APPENDIX

## PROCEEDINGS FOLLOWING REMAND

Our conclusion that the district court in each case deprived Penrod of its Seventh Amendment right to a trial by jury requires reversal of the judgments entered below with directions that new trials be held before juries unless Penrod consents under Rule 39(a) to non-jury proceedings. We think appropriate regard for husbanding judicial time requires comment upon the manner in which the issue of damages was litigated and decided below, and directions as to procedure after remand.

Dr. Thomas Mayor, an economist, testified for Starnes and Johnson in each trial for the purpose of projecting the plaintiffs' future earnings and prevailing interest rates. He stated that, in his opinion, the wages of the plaintiffs would probably increase at an annual rate of 4.8% for the remainder of their projected work-lives. In addition, he

---

3. For example, who could have predicted that in the present inflationary times both the executive and legislative branches of our national government would be advocating a tax rebate (with proportionately higher benefits to lower income taxpayers), as a means of counteracting a contemporaneous business recession.

4. Our holding in *Blue* should be viewed as in part circumscribed by the nature of that appeal and the issues arising from it. There the appellant urged as error the exclusion by the trial judge of his tendered evidence as to his gross earnings history. The trial judge had instructed the jury to take into account in determining probable lost future earnings only the evidence before it of net wages earned. The appellant in *Blue* did not seek from us a ruling that evidence as to his past net earnings was improper, but rather sought to establish only his right in addition to put before the jury evidence of his gross earnings in the past. We ruled that he should be allowed to do so. The issue as presented by the appeal did not question the admissibility as such of evidence as to past net earnings.

recommended that the present values of these projected future earnings be computed through the application of a 4% reduction factor. Dr. Mayor selected a 4% factor because an insurance company, if asked to sell to the plaintiffs single payment annuity contracts written to return the average projected earnings of the plaintiffs over their anticipated work-lives, would assume a 4% return on investment.

Dr. Burke A. Parsons, also an economist, testified for Penrod in the Starnes trial for the purpose of rebutting Dr. Mayor's testimony. Dr. Parsons expressed the view that it was impossible to project with accuracy inflationary trends in the economy and in the petroleum industry over the periods representing the remainders of the plaintiffs' projected work-lives. He stated that the 4.8% wage increase figure projected by Dr. Mayor was too high. With regard to an appropriate rate to be employed for reducing the future earnings award to present value, Dr. Parsons testified that the then prevailing interest rates of between seven and eight percent per year on blue-chip corporate bonds would provide an acceptable range of reduction factors.

The district court made the following findings of fact as to the estimated future earnings of Starnes:

"30. Plaintiff was 32 years of age on the day of the accident complained of. He was 37 years old at the time of the trial and had a life expectancy of 34.4 years. In all reasonable probability, plaintiff would have continued to work until age 65.

31. The wages of one performing the type of work that plaintiff was performing at the time of the accident in issue is likely to increase at the annual rate of 4.8% per annum. This percentage of annual increases in wages was the rate of increase of such wages from 1946 to 1969; and was the rate of annual increases which had held good from the year 1900.

32. At the time of the trial, it would have cost plaintiff $418,671.00 to purchase a single annuity, without death benefits, to yield him his average annual wage, commencing at age 38, for the duration of his life.

34. The present cash value of plaintiff's lost future earnings is $352,-424.17."

In the Johnson case the findings were considerably more abbreviated, but obviously again reflected an adoption of the views expressed by Dr. Mayor:

"21. The present value of plaintiff's loss of earnings from February 1, 1971, through the year 1997, the year at which the plaintiff would be sixty-five years of age, is $274,716.18.

27. Plaintiff was thirty-three years of age on the date of the accident complained of and had a reasonable · life expectancy of 36.69 years from such date, and a work life expectancy to the age 65."

With respect to both Starnes and Johnson the district court found that they had been rendered permanently physically unfit to perform their usual duties of employment or other forms of manual labor on a regular or continuous basis and that neither plaintiff was equipped for retraining into work not entailing manual labor.

In 1939 the Restatement of Torts declared that "[A] person whose interests of personality have been tortiously invaded is entitled to recover damages for past or prospective . . . (b) loss of earning capacity or earnings". Section 924, page 631. Comment d to that Section, dealing with loss of future earnings, observed:

"The extent of future harm to the earning capacity of the injured person is measured by the difference viewed as of the time of trial between the value of the plaintiff's services as they will be in view of the harm and as they would have been had there been no harm. This difference is the resultant derived from reducing to present value the anticipated losses of earnings during the period of the prospective life the plaintiff would have had

but for the defendant's act. Accordingly, the trier of facts must ascertain, as nearly as can be done in advance, the difference between the yearly earnings which the plaintiff probably would or could have received during his life expectancy but for the harm and the earnings which he will probably be able to receive during the period of his life expectancy as now determined. In this are considered the type of work which the plaintiff has done, the type of work which, in view of his physical condition, education, experience and age, he would have been doing and will be likely to do in the future during the working period of his life, together with all other matters reasonably relevant. A result is erroneous, however, which widely differs from that which might reasonably be reached upon the admissible data.

In ascertaining the present worth of the future loss of earnings, that is, in discounting the recovery because future losses are paid for in advance, the rate of discount is based upon the current return upon long-term investments if the prospective losses are long continued." Pages 634–635.

The impact of inflationary trends in the American economy upon the calculation of future lost earnings was perceptively discussed by Professors Harper and James in their treatise "The Law of Torts":

"Greater confusion surrounds present damages for future loss. Future trends in the value of money are necessarily unknown and so always render such damages speculative in a way we cannot escape. If the estimates represent a straight-line projection of present living costs, they will be frustrated by fluctuations either way. If prophecy of change is heeded, frustration will follow if no change, or the opposite change, occurs. When courts have consciously grappled with the problem they have either found all prophecy too speculative and so, perforce, have taken the equally speculative course of betting on a continuance of the status quo; or they have made intuitive and not always very wise judgments that present conditions represent a departure from some imaginary norm to which they think we shall rapidly return. It is not at all clear that courts would be willing to hear experts on the matter or that they would get much real help if they did. For the most part the problem—which is inevitably present in every case of future loss—is not analyzed and the present value of money is assumed to be the proper basis.

The problem is necessarily insoluble under the principle of the single lump sum recovery. It could be approached with intelligent flexibility under a system of periodic payments continuing for the duration of future needs, though such a system would post other problems including a greater administrative burden on courts and defendants." Volume II, "The Law of Torts", § 25.11, pages 1325–1326.

The United States Supreme Court addressed itself to the problem of reducing to present value lost future earnings under the Federal Employers Liability Act, which is incorporated by reference into the Jones Act, in Chesapeake & Ohio Railway v. Kelly, 1916, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117. That case was an action brought in the Kentucky state courts under the provisions of the FELA. The trial court entered judgment for the plaintiff based upon jury verdict and the Court of Appeals of Kentucky affirmed. In so affirming the appellate court approved the trial judge's refusal to instruct the jury to discount the lost future earnings figure (the refusal being based upon the theory that such a computation was too difficult for the jury). The United States Supreme Court reversed, holding that the present cash value of future earnings is the proper measure of recovery in actions brought under the Act. With regard to the selection of the proper reduction factor, the Supreme Court noted:

"Local conditions are not to be disregarded, and besides, there may be cases where the anticipated pecuniary advantage of which the beneficiary has been deprived covers an expectancy so short and is in the aggregate so small that a reasonable man could not be expected to make an investment or purchase an annuity with the proceeds of the judgment. But, as a rule, and in all cases where it is reasonable to suppose that interest may safely be earned upon the amount that is awarded, the ascertained future benefits ought to be discounted in the making up of the award.

"We do not mean to say that the discount should be at what is commonly called the 'legal rate' of interest; that is, the rate limited by law, beyond which interest is prohibited. It may be that such rates are not obtainable upon investments on safe securities, at least, without the exercise of financial experience and skill in the administration of the fund; and it is evident that the compensation should be awarded upon a basis that does not call· upon the beneficiaries to exercise such skill, for where this is necessarily employed, the interest return is in part earned by the investor rather than by the investment. This, however, is a matter that ordinarily may be adjusted by scaling the rate of interest to be adopted in computing the present value of the future benefits; it being a matter of common knowledge that, as a rule, the best and safest investments, and those which require the least care, yield only a moderate return." 241 U.S. at 490–491, 36 S.Ct. at 632, 60 L.Ed. at 1122.

McWeeney v. New York, New Haven, and Hartford Railroad Company, 2 Cir. 1960, 282 F.2d 34, cert. denied 1960, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93, was an action under the Federal Employers Liability Act. The Second Circuit, sitting en banc, held that the district court had not erred in refusing a jury instruction proffered by the defendant railroad to the effect that the jury, in calculating future loss of earnings, should consider only the plaintiff's net income after the deduction of income taxes. The Court commented upon the impact of inflation in the following manner:

"Though some courts have sanctioned instructions permitting the jury to take into account inflation between the injury and the trial, there is little or no authority in favor of charging the jury to take future inflation into account, see 2 Harper and James, The Law of Torts, § 25.11 (1956). Yet there are few who do not regard some degree of continuing inflation as here to stay and would be willing to translate their own earning power into a fixed annuity, and it is scarcely to be expected that the average personal injury plaintiff will have the acumen to find investments that are proof against both inflation and depression—a task formidable for the most expert investor. The effect of inflation of 1% a year over McWeeney's 29–year expectancy at trial would go a long way toward offsetting any excess in the verdict due to failure to deduct income tax." 282 F.2d at 38.

The Sixth Circuit, in Sleeman v. Chesapeake & Ohio Railway Company, 6 Cir. 1969, 414 F.2d 305, encountered a situation where the district court, sitting without a jury in an action brought under the Federal Employers Liability Act, computed the plaintiff's future lost earnings but refused to reduce them to present value because he believed that inflationary trends would offset any reduction to present net worth. Citing the Supreme Court's decision in Kelly, supra, the court of appeals reversed the trial court's award of damages. The appeals court observed:

"Nor do we encourage the trial courts of our circuit to explore such speculative influence on future damages as inflation and deflation.

"Of course, the nation's economic history since the 1930's would appear to make the use of present wages as the standard for loss of future earnings somewhat unfair to plaintiffs. But as to the future, the inflation versus de-

flation debate rages inconclusively at the highest policy levels of our government, in national electoral campaigns, in learned economic journals and is exemplified in the daily gyrations of the stock markets. The debate seems unlikely to be resolved satisfactorily in one personal injury trial. And if testimonial resolution of this factor bearing on the future is attempted, the door is opened to similarly speculative and debatable offsets tending in other directions. See McWeeney v. New York, N. H. & H. R.R., 282 F.2d 34 (2d Cir. 1960)." 414 F.2d at 308.

We take judicial notice of the prophetic quality of the Sixth Circuit's disapproval of judicial inquiries into projected inflationary trends in our economy by noting the President's issuance of Executive Order No. 11615, August 17, 1971, 36 F.R. 15727, exercising his powers under the Economic Stabilization Act of 1970, P.L. 91–379, 84 Stat. 799, to impose controls over prices, rents, wages and salaries.

■ Although we today reverse the judgments entered below on the jury trial question discussed *supra,* we expressly disapprove the district court's attempt to take into account, in computing the plaintiffs' future lost earnings, inflationary trends in this nation's economy for the next several decades. As the Sixth Circuit concluded in its *Sleeman* decision, we hold that the influence on future damages of possible inflation or deflation is too speculative a matter for judicial determination. Should either or both of these cases be retried before a jury, the triers of the facts should not be instructed to take into account future inflationary or deflationary trends in computing future lost earnings, nor should the jury be advised to consider such alternative descriptions of inflationary and deflationary trends as the purchasing power of the dollar or the consumer price index.

In the event of a retrial or retrials before juries, jury instructions concerning the discount rates to be applied should conform with the Supreme Court's comments in Kelly, supra, and today's decision by us in Blue v. Western Railway of Alabama, 5 Cir. 1972, 469 F.2d 487.

JOHN R. BROWN, Chief Judge (dissenting):

I respectfully dissent to the Court's decision on issues I (jury trial),[1] II (inflation),[2] and III (income tax)[3] and reserve the right to file a dissenting opinion on one or more or all of those issues.

GEE, Circuit Judge (dissenting):

I respectfully dissent from the ruling of the court en banc insofar only as it may indicate (1) that the juries which will try these cases on remand should not be advised that the lump-sum awards which they will be called on to calculate as replacements and compensation for lost future earnings will be exempt from income tax and (2) that they are to use gross earnings as their net earnings figures. I do so because, in my view, these holdings mandate largesse and not justice.

That such awards are not taxable is a relatively occult piece of information which jurors are unlikely to know, whereas the certainty of death and taxes weighs upon the serious economic reflections (if no others) of every thinking citizen and will go[1] with the jurors into the jury room when they retire. Their assumption in their deliberations can therefore only be that upon the amount which they award, as upon whatever else might be substituted for a taxable item, the hand of the collector will fall. Also under our decision, unless I have misun-

---

1. With whom Gewin and Thornberry, Circuit Judges, join.

2. With whom Goldberg and Godbold, Circuit Judges, join.

3. With whom Ainsworth and Gee, Circuit Judges, join.

1. Together with the jurors' knowledge, common to mankind and as to which they require no special instruction, that we are in a period of long-term inflation and that lawyers must be paid.

derstood it, the jurors are to consider pre-tax earnings figures to arrive at this nontaxable award. Thus we open to them the gates of fairyland and direct them to arrive at a take-home earnings figure [2]—and a lump sum to replace it—which never was and never would have been. This, I submit with deference, is not logic and should not be law.

Without belaboring the matter, it is well known that taxes on earned income may and do reach the fifty percent ceiling. One need only instance the case of, say, an able trial lawyer, an entertainer or a neurosurgeon earning $250,000 per year, having a twenty- or thirty-year work-life expectancy, killed under culpable circumstances, to grasp immediately that we here approve a blueprint for awards which may be clearly unjust by hundreds of thousands, perhaps even millions, of dollars.[3] And so juries, retiring under the full force of natural sympathy and of counsel's closing pleas to do full justice by the bereft on their only day in court, will produce verdicts incorporating generous windfall factors.[4] It is to the countenancing of these, and not to an adequate—even a generous—compensation for real losses, that I voice my dissent. One of the pointed lessons of recent times has been that the supply of golden eggs is not unlimited: just so surely as we require that one person receive more than just compensation—what he would have gotten but for the defendant's fault—somewhere another will receive less.

2. Based on gross earnings.

3. It is true the majority opinion attempts to avoid the high-tax-rate decedent problem illustrated by hinting that different rules might apply to his case. This notion, however, raises more problems than it dispels. The suggestion seems to recognize that what we do here will necessarily produce awards in some measure unjust to the defendant, who is made to pay decedent's beneficiaries an incremental amount which the government—rather than he—would have received had he lived. Doubtless a small- or middle-sized injustice is more tolerable than a large one, but I am disturbed to see us deliberately require the production of either sort. Put another way, since the suggestion all but admits that we here mandate gratuities, by what warrant do

we extend our largesse to one set of beneficiaries and not to another? And at what point are our trial courts to draw the line?

4. As noted, this is especially so since the jury is misled as to tax effects not once, but twice: first in being offered gross earnings to use in computing take-home pay, and second in receiving no hint that their award is nontaxable. Use of net earnings would be the more desirable reform since these, like other factors involved in projecting a work-life's value into the future, are at least accurate past facts. But the nontaxable character of the award should also be made known, lest the jury feel tempted or obliged to superadd a factor for taxes which the survivors will never in fact have to pay.