**Mrs. Betty Jean Lindsey HAMILTON, Individually and as Administratrix of the Succession of Billy Joe Hamilton, Jr. and as a representative for and on behalf of Susan Ann Dunn, and the minor child, Bryan Joseph Hamilton a/k/a Bryan Joseph Dunn,**

v.

**CANAL BARGE COMPANY, INC., and Petrolane Offshore Construction Service, Inc.**

**Civ. A. No. 74-682.**

United States District Court,
E. D. Louisiana.

April 2, 1975.

Supplemental Opinion May 15, 1975.

See also D.C., 395 F.Supp. 975.

Edward F. Wegmann, New Orleans, La., for plaintiffs.

Robert M. Contois, Glenn G. Goodier, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendant Central Marine.

Lemle, Kelleher, Kohlmeyer & Matthews, B. Ralph Bailey, New Orleans, La., for defendant Petrolane.

Watkins, Watkins & Walker, James C. Walker, Jr., Houma, La., for defendant Bayou Marine.

Eldon E. Fallon, Kierr, Gainsburgh, Benjamin, Fallon & Lewis, New Orleans, La., James O. Ervin, Baton Rouge, La.,

ALVIN B. RUBIN, District Judge:

Billy Joe Hamilton, Jr., an employee of Petrolane and a member of the crew of its derrick barge OCTOPUS, was killed in the course of his employment on April 26, 1973, when a part of a mooring bitt on a barge being used in connection with the work of the OCTOPUS broke off.

Petrolane had chartered the barge from Bayou Marine, which had in turn chartered it from Central Marine. The plaintiffs sued Petrolane, Bayou Marine, and Central Marine, and the various defendants cross claimed against each other.

For reasons orally assigned at the conclusion of the trial to the court, the decedent was found to have been a member of the crew of both the OCTOPUS and the barge; his death was determined to have resulted from Petrolane's negligence and from the unseaworthiness of the barge. Mr. Hamilton was found not to have been contributorily negligent. The remaining issues in the case concern the persons to whom damages are due, the amount of damages due each of them, the liability of the codefendants to the plaintiff, and the cross claims among the various defendants.

I. FACTS RELATIVE TO DAMAGES

Mr. Hamilton was 21 years of age at the time of his death. He was survived

by his mother and father, with whom he lived. He was engaged to be married to Susan Ann Dunn, who was then 16. The wedding date had been set; the minister had consented to perform the ceremony; the bride had purchased her wedding dress; she and Mr. Hamilton had purchased wedding bands; wedding invitations and napkins for the nuptial reception had been printed; and the couple had rented an apartment. After Mr. Hamilton's death, Ms. Dunn learned from her doctor that she was two months pregnant; the medical and factual testimony leaves no doubt that Mr. Hamilton was the father. The healthy, full-term child who was later born is one of those for whom damages are sought; the others are Mr. Hamilton's fiancee, and his parents.

 Mr. Hamilton was a Jones Act seaman. That act confers both an action for his wrongful death and an action by his survivors for any damages he suffered before death. In addition, an action lies under the general maritime law, as set forth in Moragne v. States Marine Lines, 1970, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339, for wrongful death as a result of unseaworthiness. As the accident occurred less than three miles from shore, there is no cause of action under the Death on the High Seas Act, 46 U.S.C. §§ 761–768 (hereafter cited as DOHSA).[1]

## II. PAIN AND SUFFERING OF THE DECEDENT

 Mr. Hamilton was struck in the head by a piece of metal from the bitt. A fellow worker who was at his side seconds after he fell to the deck testified Mr. Hamilton was breathing but unconscious. Though he lived for two hours thereafter, there is no evidence that he suffered conscious pain. He was breathing hard, but no one heard him utter a sound. Accordingly, I find no evidence of conscious pain and suffering. Mpiliris v. Hellenic Lines, Ltd., S. D.Tex.1969, 323 F.Supp. 865.

## III. PARENTS' CLAIMS

Mr. Hamilton's parents were not supported by him. He lived in his parents' home, together with three of his four brothers. Mr. Hamilton appears to have been an exemplary young man. He assisted with household expenditures from time to time, mowed the pasture, took care of his younger brothers, but he did not pay rent. The family kept no financial accounts; they were loving, close knit and church-going.

The elements of damages claimed by the parents are twofold; their pecuniary loss of whatever the decedent would have contributed in the way of financial aid and in the form of services, and the loss of the society of their son.

 No claim may be asserted by the parents under the Jones Act. The

---

1. No action lies under state law to recover damages for wrongful death occurring on navigable waters; the wrongful death action under the general maritime law has preempted the field. To allow a state death claim to be joined with a Jones Act, or a Moragne claim, or even both, would destroy the uniformity Moragne sought. It is true that the Fifth Circuit in Dennis v. Central Gulf S. S. Corp., 5th Cir. 1972, 453 F.2d 137, said in what may be dicta that the Louisiana survivor statute applied in a post-Moragne claim. See also Dugas v. National Aircraft Corp., 3d Cir. 1971, 438 F.2d 1386. Later cases, however, have made no mention of the application of state law ex proprio vigore; rather state law has been referred to only for "persuasive analogy". Petition of M/V Elaine Jones, 5th Cir. 1973, 480 F.2d 11. Insofar as Dennis permitted the application of state law to govern the legal relationships of parties arising out of a death occurring on navigable waters, that decision took an unfortunate approach that can be considered overruled sub silentio by subsequent jurisprudence. See also Sea-Land Services, Inc. v. Gaudet, 1974, 414 U.S. 573, 94 S.Ct. 806, 817 n.24, 39 L.Ed.2d 9. There the Supreme Court indicated approval of Dugas and therefore Dennis. No consideration was given to the question of preemption of state law by federal maritime law; this abbreviated reference should not be taken as dispositive of the issue. See also Green v. Ross, 5th Cir. 1973, 481 F.2d 102, 103 n.4.

Jones Act incorporates the F.E.L.A., the pertinent part of which permits the personal representative of the deceased to maintain an action for damages "for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee . . . ." 45 U.S.C. § 51. Thus, the existence of a preferred class of beneficiaries excludes recovery by the inferior classes, or to put it in less technical language, if the deceased is survived by children, his parents are not permitted to claim damages, no matter how grievous their injury.

The existence of this statutory remedy in favor of certain claims of beneficiaries, however, does not preclude all possibility of recovery by the parents. In Sea-Land Services, Inc. v. Gaudet, 1974, 414 U.S. 573, 94 S.Ct. 806, 39 L. Ed.2d 9, the Supreme Court in holding that the wrongful death action under the general maritime law includes the right to recover for the loss of society, said

> After combing the legislative history of the Death on the High Seas Act, we concluded in *Moragne* that Congress expressed "no intention . . . of foreclosing any nonstatutory federal remedies that might be found appropriate to effectuate the policies of general maritime law." *Moragne*, 398 U.S., at 400, 90 S.Ct., at 1787. Nothing in the legislative history of the Act suggests that Congress intended the Act's statutory measure of damages to pre-empt any additional elements of damage for a maritime wrongful death remedy which this Court might deem "appropriate to effectuate the policies of general maritime law." 94 S.Ct. at 816 n. 22.

These remarks are addressed to DOHSA; their logic extends to the relationship of the Jones Act to the maritime death action. The *Moragne* Court understood that its recognition of the cause of action for wrongful death created an issue "that has no precise coun-

terpart in the established law governing nonfatal injuries," that is, "the determination of the beneficiaries who are entitled to recover." 398 U.S. at 406, 90 S. Ct. at 1791. It summarized the government's argument that *Moragne* actually should borrow the schedule of beneficiaries set forth in DOHSA, and concluded that determination of the issue should "await further sifting through the lower courts in future litigation." 398 U.S. at 408, 90 S.Ct. at 1792. Hence, though DOHSA is not applicable here, we can at least consider the results of its possible application.

■ The existence of a claim on behalf of certain classes of beneficiaries under the Jones Act has been held not to bar recovery by other classes under DOHSA. The Four Sisters, D.Mass. 1947, 75 F.Supp. 399. See also In re M/V Elaine Jones, 5 Cir. 1973, 480 F.2d 11. Application of the Jones Act schedule of beneficiaries to a *Moragne* action would once again create geographic boundary problems, as the place of injury would once again determine the rights of the beneficiaries. Thus, the DOHSA schedule would be applicable where death occurred on the high seas, but not where death occurred in state territorial waters. The uniformity sought by *Moragne* would be defeated. Hence, it appears sound here to borrow from DOHSA and permit the parents' claim notwithstanding the concomitant claim by Mr. Hamilton's posthumous son.

■ The Supreme Court's decisions in Gillespie v. United States Steel Corp., 1964, 379 U.S. 148, 85 S.Ct. 308, 13 L. Ed.2d 199, and Lindgren v. United States, 1930, 281 U.S. 38, 50 S.Ct. 207, 74 L.Ed. 686, which held that the Jones Act precluded the application of state wrongful death provisions, do not compel a different result. Those cases dealt with the preclusion of state law by the Jones Act, not the question whether the Jones Act provided the exclusive federal remedy. Indeed, in *Lindgren*, the Court said that the general maritime law was

inapplicable because no action could be maintained for wrongful death under the general maritime law at that time, and expressly avoided saying that the Jones Act excluded the application of other federal remedies. It is well settled that the Jones Act does not bar the operation of DOHSA; there is no reason for it to exclude the *Moragne* remedy.

While the existence of a Jones Act remedy in favor of some beneficiaries does not preclude an action under the general maritime law on behalf of others, the recognition of the right of parents to recover even though their son was survived by a child leads to another issue: if the parents were not dependents, but were merely financially affected by the death, may they claim the damages they suffered? Put another way, the issue is whether the persons named in DOHSA as beneficiaries may recover even when they were not dependent on the deceased.

■ In *Gaudet*, the Court said, "the decedent's *dependents* may recover damages for their loss of support, services, and society," 94 S.Ct. at 814 (emphasis supplied), making no mention of the

right of non-dependent relatives to recover. Under neither the Jones Act nor DOHSA, however, is dependency required for a parent to recover. In re Risdal & Anderson, D.Mass.1968, 291 F.Supp. 353. This is the clear intent of both statutes,[2] which, in listing beneficiaries, modify only "relatives" (DOHSA) or "next of kin" (Jones Act) with the adjective "dependent." Dependency is not a prerequisite to recovery by parents in Louisiana, La.Civ. Code art. 2315, nor in most other states. W. Prosser, Law of Torts § 127 (4th ed. 1970). It would therefore seem untoward to read a dependency requirement into the *Moragne* action for wrongful death.[3]

I therefore hold that Mr. Hamilton's parents are entitled to recover for the loss of their son. This right includes pecuniary loss suffered, and the loss of his society. Sea-Land Services, Inc. v. Gaudet, 1974, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9.

■ The parents have shown a modest loss of support. They have proved a significant loss of the society of a dearly beloved, well brought up and dutiful son.

2. 45 U.S.C. § 51:

Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, or between the District of Columbia and any of the States or Territories, or between the District of Columbia or any of the States or Territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, *in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee,* for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment. (Emphasis supplied.)

46 U.S.C. § 761:

Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued.

3. Authorities as eminent as professors Gilmore and Black intimate a different conclusion. G. Gilmore & C. Black, The Law of Admiralty § 6–30 at 361, n.174 (2d ed. 1975). But dependency is not a requirement to the existence of a cause of action in favor of parents. DOHSA creates a cause of action in favor of parents, without any mention of dependency. Of course, since recovery under DOHSA is limited to pecuniary loss, nondependent parents may often fail to prevail on the merits. This does not, however, negate a cause of action in their favor.

The court awards damages in the amount of $20,000 per parent. This sum also includes allowance for the services that he from time to time performed for his parents, which would have diminished once he established his own home.

## IV. THE POSTHUMOUS CHILD, BRYAN JOSEPH DUNN

A posthumous child may recover for the wrongful death of his parent; the important issue is whether the decedent was the parent, not the date when the child was born. Thus, for example, a posthumous child is entitled to benefits under the LHWCA, Texas Employers' Ins. Ass'n v. Shea, 5th Cir. 1969, 410 F.2d 56, and is entitled to recover under Louisiana law, La.Civ.Code art. 29, as well as under most state death statutes. *See, e. g.*, St. Louis-San Francisco Ry. Co. v. Pearson, 170 Ark. 842, 281 S.W. 910; Shaw v. Chicago & A. R. Co., 314 Mo. 123, 282 S.W. 416; Brantley v. Boone, Tex.Civ.App., 34 S. W.2d 409. Compare Williams v. American Employers Ins. Co., 1959, 237 La. 101, 110 So.2d 541.

That a child born out of wedlock is entitled to damages for loss of his parent under both the Jones Act and DOHSA is well established. Levy v. Louisiana, 1968, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436; Civil v. Waterman S. S. Corp., 2d Cir. 1954, 217 F.2d 94; 1 Edelman, Maritime Injury and Death 133 (1960).

The child's loss of support is not measured by his father's net earnings at the time of death, but by gross earnings. Petition of M/V ELAINE JONES, 5 Cir. 1973, 480 F.2d 11, 28; Cunningham v. Rederiet Vindeggen A/S, 2 Cir. 1964, 333 F.2d 308, 314. These authorities are based on ample reason. A worker's net earnings are determined in part by the income tax levied on him. In this case, Mr. Hamilton's tax was computed on the basis that he was a single man, without dependents. The birth of a child would have reduced his tax.

His anticipated marriage would also have reduced it. The anticipated reduction in the rates for 1975 would have changed it. So we base computation on Mr. Hamilton's gross earnings at the time of his death, an annual rate of $8,320.

Mr. Hamilton was of a stable disposition, his life was home-centered, and he had received the benefits of an affectionate rearing and loving parents. He was apt to have been a devoted father. In determining the child's damages we must consider Mr. Hamilton's disposition, his personal needs and the likely needs of his wife.

The child is entitled to recover for a number of items. The items, and the amount allowed for each are set forth below:

A. *Loss of support to the date of judgment:*

In my opinion Mr. Hamilton would have contributed not less than the sum of $150 monthly to the support of his child. That amount is adopted as the basis for this computation, and I allow for loss of support from birth, December 5, 1973, to March 1, 1975, the sum of $2,250.

B. *Loss of future support, discounted to present value:*

There are two issues here: the amount of future support and its duration. As stated above, I feel the sum of $150 a month is a just amount to compensate for the loss of support. The LHWCA awards a child death benefits until he is 18, or so long as he is a student pursuing full time studies and has not reached 23. 33 U.S.C.A. § 902(14) and (18). There can be no certainty that Mr. Hamilton's son will be a full time student after he reaches 18.

However, it appears likely from the child's environment that he would attend college. Allowing damages to the time when most children finish an undergraduate college education appears just, in the light of the circumstances. Accord-

ingly, these damages are allowed until the child's 22nd birthday, a period of 249 months. Discounted to present value at 6% per annum, I allow the sum of $21,042.90.

C. *Award for future loss of support that would accrue by virtue of increases in the father's pay.*

 A number of related factors have been discussed as potentially allowable damages. Some writers speak of making an allowance for future inflation and for diminution in the purchasing power of the award. Henderson, Some Recent Decisions on Damages; With Special References to Questions of Inflation and Income Taxes, 40 Ins.Counsel J. 423 (1973); Comment, 5 Cumberland—Samford L.R. 71 (1974). But neither of these is an item of damage caused by death or by prepayment of future wages. That money invested now may buy less in material goods five years from now proves no loss; for, if the decedent had been employed 5 years from now at today's wages, he would be able to buy less with his earnings. For this reason, and in the light of Johnson v. Penrod Drilling Company, 5th Cir. 1975 (en banc) 510 F.2d 234, I deny any allowance for inflation or increased cost of living.

 On the other hand there is evidence that the decedent's earnings would likely have increased in the future. Historically, a youthful individual has tended to garner increased earnings for the same employment. Thus, on historical evidence, if Mr. Hamilton had never gotten a single promotion, he would likely have received periodic increases in pay as a result of increased skill, seniority, and like factors. As a young and hard-working man, he could have expected to increase his skill and productivity, and to have received pay increases for this. It appears reasonable to assume that he would have devoted an appropriate portion of these increases to his child's support. I think it appropriate to allow for this factor, at a rate of 4% per annum.

Based on 249 months at $150 per month, I therefore allow the additional sum to cover the future changes in the decedent's salary as a result of increased wages and hence the future increases in the child's support, the sum of $9,514.[4]

D. *Loss of Society*

 The son is entitled to claim the damages caused by loss of his father's society. See *Gaudet, supra,* and Skidmore v. Grueninger, 5 Cir. 1975, 506 F.2d 716. For the loss of his father's society, it appears to me to be reasonable to allow Mr. Hamilton's son the sum of $25,000.

This sum is not to be reduced because Ms. Dunn has now married. See Blumenthal v. United States, E.D.Pa.1960, 189 F.Supp. 439; United States v. The S.S. Washington, E.D.Va.1959, 172 F.Supp. 905; The City of Rome, S.D.N.Y. 1930, 48 F.2d 333. It is hoped that her husband will be a good foster parent to Billy Joe's child and that their marriage will be stable. But those possibilities are too conjectural to be allowed to reduce the damages Bryan will more likely sustain.

## V. DECEDENT'S INTENDED WIFE

Neither DOHSA, the Jones Act, nor state death actions recognize as a beneficiary anyone other than a relative. Death is a rupture in the social fabric. It causes loss to many, to fiancees and neighbors, to friends, to organizations to which the decedent belonged, to charities he may have supported, and in individual cases to many others who may have loved the deceased and been seriously affected by his death. But statutes granting a right to recover for the loss occasioned by death have always been limited to relatives, and, as we have seen, in

---

4. This figure was reached by adding the 4% augmentation for prospective increases in wages to the base amount, and discounting this figure at 6%. Then the figure computed without the 4% augmentation was subtracted to compute the difference.

988

some instances only to those who were also dependents.

■ No one can doubt that Ms. Dunn was injured by Mr. Hamilton's death, or that the entire course of her life has been altered. But she was not a relative; hence she may not be awarded money damages for the grievous hurt she has suffered. Compare In re Sincere Navigation, E.D.La.1971, 329 F. Supp. 652.

■ Nor can damages be awarded her on the basis that the defendants caused her fiancee to breach his promise of marriage. No attempt need be made to ascertain whether state law or federal law should determine the liability for an interference with such a relationship by breach of a duty imposed by the maritime law. Louisiana does not recognize any action for interference with contractual relations, Cust v. Item Co., 1942, 200 La. 515, 8 So.2d 361; and the maritime law does not recognize an action for negligent interference with a contractual relationship. Kaiser Aluminum & Chemical Corp. v. Marshland Dredging Co., 5th Cir. 1972, 455 F.2d 957.

## VI. LIABILITY OF CENTRAL MARINE

At the conclusion of the trial, I indicated that Central Marine should be exonerated from liability to the plaintiffs. Upon reconsideration of the facts and the law applicable, I now believe that Central Marine should be cast in judgment, although, for reasons given in this opinion, *infra*, Central Marine is entitled to indemnity from Petrolane.

■ Whether Central Marine could be held liable for the unseaworthiness of the barge caused by conditions arising after the vessel had been demised is a question not entirely answered in the jurisprudence. *Compare* Ramos v. Beauregard, 1st Cir. 1970, 423 F.2d 916, 918; *with* Welch v. J. Ray McDermott, W.D. La.1972, 336 F.Supp. 383. *See* Grigsby v. Coastal Marine Service of Texas, Inc., 5th Cir. 1969, 412 F.2d 1011, 1030-31. This question need not be answered

here, however, as the unseaworthy condition existed in part at the time of the demise, although the barge was both rendered more unfit and the unseaworthy condition brought into play through the fault of Petrolane.

The CBC-407 was an inland barge, neither designed nor certificated for operations offshore, where the accident in question took place. Mr. A. O. Duval, a marine surveyor, testified as to the difference in construction of bitts on inland and offshore barges: on inland barges, the bitt is attached by a double plate on the deck; on offshore barges, the bitt penetrates the main deck and is attached to internal structures of the barge. There was also testimony to the effect that the bitt was corroded, a condition existing at the time of the demise from Central Marine to Bayou Marine. The inherent weakness of construction of the bitt for offshore service plus the corroded condition of the bitt combined to cause the bitt to break when subjected to the continued stress of offshore work.

■ In Crumady v. The Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413, the "condition" causing the plaintiff's injuries was not inherently dangerous; while the ship's personnel had set the circuit breakers on the unloading gear at twice the safe working load, no danger was created until the stevedores placed too much stress on the gear. The Supreme Court found the vessel to be unseaworthy. Similarly, the condition of the bitt, while unquestionably the cause of the accident, would have created no danger had not Petrolane put the barge to a use for which it was not intended. While the Court in *Crumady* did not consider whether the vessel owner could be held liable in personam, it is well settled that a vessel owner is personally liable for conditions arising prior to the demise. Cannella v. Lykes Bros. S. S. Co., 2d Cir. 1941, 174 F.2d 794. Accordingly, Central Marine is liable to the plaintiffs for the death of Mr. Hamilton.

## VII. LIABILITY OF BAYOU MARINE

 If Bayou Marine Corporation is to be held liable to the plaintiffs, it must be because Bayou Marine Corporation was under some legal obligation to the decedent. Petrolane had control of the flotilla and the work situation. Bayou Marine's personnel were under Petrolane's control and subject to its instructions. They put the barge where instructed, moved it when told, and, when it was in use, the barge was entirely at Petrolane's command. Petrolane ordered Bayou Marine personnel to move the CBC–407 offshore. The injury to Hamilton was not a result merely of their moving the barge offshore, but of the barge's continued presence in exposed waters and its resultant subjection to continued stress. The duration of the barge's offshore presence was thus the cause in fact of the injury, not the act of moving it offshore, an act not itself intrinsically hazardous. Bayou Marine's knowledge of the location of the barge was not of itself a cause of the Hamilton death. Thus, no negligence can be found on the part of Bayou Marine.

There is no authority for holding a charterer liable for unseaworthiness when the vessel has been sub-demised and the unseaworthy condition existed at the time the vessel owner was in possession and was brought into play by the negligence of the sub-demisee. Bayou Marine was neither the owner nor the owner pro hac vice of the CBC–407. Accordingly, Bayou Marine is not liable to the plaintiffs.

## VIII. PETROLANE'S CROSS-CLAIM AGAINST BAYOU MARINE

 While a charterer warrants the seaworthiness of the vessel chartered, Poor on Charter Parties and Bills of Lading § 3 (5th ed. 1968), it has been previously pointed out that the CBC–407 was fit for its intended use as an inland barge. There was no warranty by Central Marine that the barge was anything but what it was represented to be, an in-land barge. Petrolane elected to take responsibility for putting it to a use that was essentially offshore. The testimony satisfies me that Mr. Tisdale, Petrolane's president, knew very well what he was doing and made a decision to use the barge in this way simply because no certificated barge was available. Hence, the implied warranty was negated by the use to which the barge was put. In addition, the exhibits reveal that Bayou Marine was merely an accommodation party to the transaction. It billed Petrolane only for what it paid Central Marine, other than a 5% discount, which scarcely covered overhead and administrative cost.

Hence the cross-claim against Bayou Marine is dismissed.

## IX. THE INDEMNITY CLAIM OF CENTRAL MARINE AGAINST PETROLANE

 The implied agreement to indemnify a party held liable for unseaworthiness arose in maritime contracts where the indemnitor was to provide a service for the vessel owner. Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133. One overriding principle may be distilled from the cases discussing this implied cause in maritime contracts: where some act of the indemnitor performed within the sphere of the contractual relationship subjects the indemnitee to liability without fault, indemnity is due. Davis v. Chas. Kurz & Co., 9th Cir. 1973, 483 F.2d 184; Hobart v. Sohio Petroleum Co., 5th Cir. 1971, 445 F.2d 435; Transcontinental Gas Pipe L. Corp. v. Mobile Drilling Barge, 5th Cir. 1970, 424 F.2d 684; Loffland Bros. Co. v. Roberts, 5th Cir. 1967, 386 F.2d 540; Ocean Drilling & Exploration Co. v. Berry Bros. Oilfield Service, Inc., 5th Cir. 1967, 377 F.2d 511. This obligation encompasses the amount of any judgment plus the expenses incurred in defending the suit, Sommer Corp. v. United Fruit Co., 5th Cir. 1973, 479 F. 2d 1131. A similar implied indemnity

agreement has been extended beyond the "warranty of workmanlike service" in maritime service contracts to time charters. In Nichimen Co. v. M. V. Farland, 2d Cir. 1972, 462 F.2d 319, the allocation of burden of proof under the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–1315, resulted in the liability of the vessel owner; the charterer who had been contractually responsible for loading the vessel was required to indemnify the vessel owner. It would be illogical to imply the indemnity obligation in service contracts and time charters, contractual relationships where the vessel owner retains control of the vessel, and refuse to imply it in a bareboat charter, where the indemnitor takes complete control of the ship. I therefore hold that a demise charterer has an obligation to indemnify the vessel owner when the charterer operates the vessel in a manner subjecting the vessel or vessel owner to liability for unseaworthiness.

■ Here the vessel owner, Central Marine, was not in privity with Petrolane, the party whose fault gave rise to Central Marine's liability. In Waterman S. S. Corp. v. Dugan & McNamara, Inc., 1960, 364 U.S. 421, 81 S.Ct. 200, 5 L. Ed.2d 169, however, the Supreme Court settled any disputes as to whether privity between the indemnitor and shipowner is required, or whether the party contracting with the indemnitor must be a party to whom the implied indemnity agreement runs. There, the consignee of the cargo engaged the stevedore whose activities brought about the unseaworthiness of the vessel; the stevedore was held liable to indemnify the shipowner. Similarly, by chartering the barge CBC–407 from Bayou Marine, Petrolane implicitly agreed to conduct its operations in a manner that would not subject the owner of the barge to liability for unseaworthiness. Petrolane breached this obligation by knowingly using the barge for a purpose for which it was not intended. Accordingly, Central Marine is entitled to indemnity for any sums it may be required to pay the plaintiffs,

and for reasonable attorneys' fees and other expenses incurred in defending the suit.

## X. THE INDEMNITY CLAIM OF BAYOU MARINE AGAINST PETROLANE

■ The foregoing reasons do not necessarily determine the outcome of Bayou Marine's cross-claim for indemnity against Petrolane. As I have pointed out, Bayou Marine was not subject to liability without fault for unseaworthiness; this exposure has often been the touchstone for allowing or denying indemnity. Davis v. Chas. Kurz & Co., 9th Cir. 1973, 483 F.2d 184; Hobart v. Sohio Petroleum Co., 5th Cir. 1971, 445 F.2d 435. However, where there is a relationship between the shipowner and the indemnitor that gives rise to an implied indemnity agreement, the party contracting with the indemnitor is likewise entitled to his costs of defense when he is sued directly by the injured party, even if he is not a party owing a duty to furnish a seaworthy vessel. D/S Ove Skou v. Hebert, 5th Cir. 1966, 365 F.2d 341. Therefore, Bayou Marine is entitled to recover the costs of defense.

■ These results are also reached by reference to nonmaritime jurisprudence. Ordinarily attorney's fees and costs of defense are not recoverable in an action for breach of contract in the absence of a specific provision or statute allowing them. But when the contractual violation forces one of the contracting parties to defend an action against it brought by a third party the cost of defending that litigation can be recovered. Southern Nat. Bank v. Crateo, Inc., 5 Cir. 1972, 458 F.2d 688, 696; Wilshire Oil Co. v. Riffe, 10 Cir. 1969, 409 F.2d 1277, 1284–85; Artvale, Inc. v. Rugby Fabrics Corp., S.D.N.Y.1964, 232 F.Supp. 814, 825–26; inferentially Lacour v. Merchants Trust and Sav. Bank, La.App.1963, 153 So.2d 599. Thus, when a charterer breaches a charter party and that breach subjects the vessel

owner to suit by a third party, the charterer is required not only to indemnify the vessel owner for any damages the third party recovers, but also to reimburse the owner for the expenses incurred in defending against the suit.

For these reasons judgment will be rendered in favor of Central Marine and in favor of Bayou Marine against Petrolane for their respective attorney's fees and costs necessarily incurred in defense of this action. If the parties cannot agree on a sum within 15 days, the issue will be referred to a Magistrate for determination.

### XI. LIMITATION OF LIABILITY

 The defendants in their answer seek to limit their liability to the value of their vessel at the time of the decedent's fatal injuries. If this were permitted, the limitation fund would consist of both vessels since they were used for a common purpose under a common command. In re Brown & Root Marine Operators, Inc., S.D.Tex.1965, 267 F.Supp. 588, aff'd 5 Cir. 1967, 377 F.2d 724. Nevertheless, the court need not consider the components of the limitation fund since the defendants failed to carry their burden of proving an absence of privity and knowledge of the incidents surrounding the decedent's fatal injuries. The evidence indicates that Petrolane knew of the defective condition of the Barge CBC–407 and of the fact it was being put to an unintended use, in violation of the charter. Therefore, the defense of limitation is denied. In re Seaboard Shipping Corp., 2 Cir. 1971, 449 F.2d 132. See also 1 Edelman, Maritime Injury and Death 603 (1960).

### SUPPLEMENTAL OPINION

The parties having been unable to agree upon a manner of computing the damages in this case, the court is called upon to do so. The manner used by the plaintiff's economist compute the loss of future contributions by the decedent is hereby approved and the judgment previously entered shall stand as the judgment of the court.

██ The damages awarded for the sums that the deceased would have contributed to his minor son were computed in the following manner: a base of $150 per month was found by the court to be the amount that Mr. Hamilton would likely have contributed; the economist multiplied this by twelve to reach a base of $1800 for the first year. As the Court found that Mr. Hamilton's wages would probably have increased by 4% per annum, whatever the state of the economy, because of Mr. Hamilton's personal characteristics, the base figure of $1800 was increased by 4%, to give a figure of $1872 for the second year, $1946.88 for the third year, etc., throughout the 20.75 years for which the Court found it likely that Mr. Hamilton would have supported his son. See the attached appendix. This award was then discounted by 6% in the usual fashion. For example, in the tenth year, Mr. Hamilton would have contributed $2561.95 to his son; the amount necessary to equal $2561.95 ten years hence when earning 6% is $1487.78. This was done for every one of the years for which an award was made; the awards for each of the years were then added together.

██ The defendant Petrolane has objected to this manner of calculation, claiming that the unaugmented yearly award (i. e., $1800 without the 4% per annum augmentation because of Mr. Hamilton's proven abilities to advance himself) should have been totalled and discounted, and only then should the 4% per annum increase been added in. The mathematical reasons for this argument as expressed by the defendant are somewhat less than illuminating, and neglect some basic considerations. The award cannot be discounted until computed; until the 4% augmentation has been added in, we do not know what Mr. Hamilton would have earned and contributed to his son. The defendant apparently assumes that the 4% was

made to offset inflation. The recent decision in Johnson v. Penrod Drilling Co., 5th Cir. 1975 (en banc), 510 F.2d 234, forecloses any consideration of "inflation" as such, and no award was made to offset the upward spiral of prices and wages in our economy. Whether a different method of computing the loss would be called for if purely economic considerations were looked to as a basis for the 4% augmentation is a question that need not be answered; it is fundamental that the present value of an award to recompense Bryan Hamilton for a loss of support in future years cannot be ascertained until it is determined how much support his father would have contributed in those years.

 The plaintiff has also called to the court's attention that inadvertently the court made no award for the loss of nurture and guidance by the decedent's son. There is of course a difference between loss of society, for which an award was made, and the loss of nurture and guidance. The Fifth Circuit in Law v. Sea Drilling Corp., 1975, 510 F.2d 242, indicated that the two were separate and that a separate award should be made for both. As Mr. Hamilton's son has suffered not only the loss of his father's love, affection, and companionship, but also the loss of discipline and training that his father would have given him, an award of $50 per month until Bryan Hamilton is 18 years of age is accordingly given. This should be discounted at the rate of 6% per annum.

The plaintiffs have also suffered the loss of the use of the money to which they are entitled as damages, accordingly interest is awarded from the date of death for those elements of damages that accrued prior to the judgment. Of course, no interest should attach to the elements of damages that are intended to recompense for future losses; the plaintiffs have not suffered any loss by delay in paying these items. See In re City of New York, 2d Cir. 1964, 332 F.2d 1006. Accordingly, the plaintiffs are awarded interest at the rate of 7% from the date the damages were sustained (the date of death in the case of the losses the parents have suffered, and December 5, 1973, the date Bryan Hamilton was born in the case of the damages he has suffered) on the sum of $28,000 with interest on the remainder from date of judgment until paid. This sum was arrived at as a result of the following computation, all approximate, but nearly enough accurate to do substantial justice and yet avoid the necessity of further actuarial recomputations:

| | Interest from the date the damages were sustained | Interest from date of judgment |
|---|---|---|
| Losses suffered by the parents | $10,000 each | $10,000 each |
| Bryan Hamilton's loss of support | 2,250 | 30,556.90 |
| Bryan Hamilton's loss of society | 5,000 | 20,000 |
| Bryan Hamilton's loss of nurture and guidance | 750 | 10,050 |

The defendant Central Marine Service has moved for a reconsideration of the court's opinion holding Central Marine liable for the unseaworthiness of the barge CBC–407; the defendant Petrolane has asked the court to reconsider

its award insofar as it allowed for a 4% per annum increase in the decedent's wages. For the reasons that follow, both motions are denied.

In a very persuasive brief, counsel for Central Marine has set forth a version of the facts supporting Central Marine's contention that the sole cause of the blow to Mr. Hamilton was the stress placed upon the bitt by the heavy seas of the Gulf, a force for which the barge was not designed. There was, however, evidence that corrosion had contributed to the breaking of the bitt. The court found that the corrosion was a contributing cause.

But even if the corrosion had played no part in the accident, Central Marine would be liable. There can be no argument that the vessel itself would not be liable in rem; Central Marine merely maintains that no personal liability attaches because the condition did not exist prior to the time the vessel was demised to Bayou Marine. It is clear that the barge was not fit for service as an offshore barge at the time of the demise; this is a condition of the CBC-407 that contributed to making it unseaworthy, and it did exist prior to the demise. It is irrelevant that this unseaworthy condition was brought into play only by the act of Petrolane; as pointed out in the original opinion, the Supreme Court in Crumady v. The Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413, held that the vessel is liable where the condition becomes dangerous only as a result of the acts of a third party. As between vessel owner and innocent seaman, the vessel owner who charters his vessel should bear the risk that the charterer will use the vessel in a manner rendering it unseaworthy rather than the seaman. Furthermore, it would be anomalous to refuse to find personal liability where the vessel is clearly liable in rem, in a day when the distinction between in personam liability of the vessel owner and the in rem liability of his property

has been recognized as an ancient fiction of somewhat limited utility unless limitation has been properly put at issue. See Continental Grain Co. v. Barge FBL-585, 1960, 364 U.S. 19, 80 S.Ct. 1470, 14 L.Ed.2d 1540.

The defendant Petrolane has requested the court to reconsider that part of the original opinion finding that the decedent's wages would have increased at the rate of 4% per annum; it claims that the recent decision in Law v. Sea Drilling Corp., 5th Cir. 1975, 510 F.2d 242, forecloses such an award. That decision, however, talks of "inflationary damages" and "cost of living increases," items of damage not considered by this court in assessing the damages recoverable by the plaintiffs. The Fifth Circuit's decision in Law (or its decision in Johnson v. Penrod Drilling, 510 F.2d 234) could have expressly held an award for future increases due to individual initiative and ability was impermissible; the decisions did not do so.

One final matter remains to be disposed of. The plaintiff has asked that the award to the decedent's son be increased, claiming that the court's refusal to award damages to the decedent's prospective bride should inure to the son's benefit. The argument is meritless. Simply because the prospective wife has no action at law to recover the damages she has suffered does not alter the facts: the decedent would likely have married and supported her. In addition, whether or not he did so, the decedent would have contributed only a certain amount to his son; this finding of fact is not to be altered by an event occurring subsequent to the death of the decedent, i. e., the court's disallowance of an award to Ms. Dunn.

Accordingly, the judgment is amended to allow an award for the loss of nurture and guidance and to provide for interest; in all other respects the original opinion of April 12, 1975, shall be the judgment of the Court.

Appendix to follow

APPENDIX

$1800 Per Annum 6%

| 4% Increase Factor Discounted at 6% Over 20.75 years (249 months) | | 4% | Total Increased Value | Discounted Value of $1.00 | Net Due |
|---|---|---|---|---|---|
| 1 | 1800.00 | 72.00 | 1872.00 | .94340 | 1766.04 |
| 2 | 1872.00 | 74.88 | 1946.88 | .89000 | 1732.72 |
| 3 | 1946.88 | 77.87 | 2024.75 | .83962 | 1700.02 |
| 4 | 2024.75 | 80.99 | 2105.74 | .79209 | 1667.93 |
| 5 | 2105.74 | 84.23 | 2189.97 | .74726 | 1636.47 |
| 6 | 2189.97 | 87.60 | 2277.57 | .70496 | 1605.60 |
| 7 | 2277.57 | 91.10 | 2368.67 | .66506 | 1575.30 |
| 8 | 2368.67 | 94.75 | 2463.42 | .62741 | 1545.57 |
| 9 | 2463.42 | 98.53 | 2561.95 | .59190 | 1516.41 |
| 10 | 2561.95 | 102.47 | 2664.42 | .55839 | 1487.78 |
| 11 | 2664.42 | 106.58 | 2771.00 | .52679 | 1459.73 |
| 12 | 2771.00 | 110.84 | 2881.84 | .49697 | 1432.18 |
| 13 | 2881.84 | 115.27 | 2997.11 | .46884 | 1405.17 |
| 14 | 2997.11 | 119.88 | 3116.99 | .44230 | 1378.64 |
| 15 | 3116.99 | 124.68 | 3241.67 | .41727 | 1352.65 |
| 16 | 3241.67 | 129.66 | 3371.33 | .39365 | 1327.12 |
| 17 | 3371.33 | 134.85 | 3506.18 | .37136 | 1302.05 |
| 18 | 3506.18 | 140.24 | 3646.42 | .35034 | 1277.49 |
| 19 | 3646.42 | 145.86 | 3792.28 | .33051 | 1253.39 |
| 20 | 3792.28 | 151.69 | 3943.97 | .31180 | 1229.72 |
| 21 * | 2957.97 | 118.32 | 3076.29 | .29416 | 904.92 |
| | | | | Total | $30,556.90 |

* 9 Months or .75 of 1 yr.